(Slip Opinion) OCTOBER TERM, 2015 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UTAH *v.* STRIEFF

### CERTIORARI TO THE SUPREME COURT OF UTAH

No. 14–1373. Argued February 22, 2016—Decided June 20, 2016

Narcotics detective Douglas Fackrell conducted surveillance on a South Salt Lake City residence based on an anonymous tip about drug activity. The number of people he observed making brief visits to the house over the course of a week made him suspicious that the occupants were dealing drugs. After observing respondent Edward Strieff leave the residence, Officer Fackrell detained Strieff at a nearby parking lot, identifying himself and asking Strieff what he was doing at the house. He then requested Strieff's identification and relayed the information to a police dispatcher, who informed him that Strieff had an outstanding arrest warrant for a traffic violation. Officer Fackrell arrested Strieff, searched him, and found methamphetamine and drug paraphernalia. Strieff moved to suppress the evidence, arguing that it was derived from an unlawful investigatory stop. The trial court denied the motion, and the Utah Court of Appeals affirmed. The Utah Supreme Court reversed, however, and ordered the evidence suppressed.

*Held*: The evidence Officer Fackrell seized incident to Strieff's arrest is admissible based on an application of the attenuation factors from *Brown* v. *Illinois*, 422 U. S. 590. In this case, there was no flagrant police misconduct. Therefore, Officer Fackrell's discovery of a valid, pre-existing, and untainted arrest warrant attenuated the connection between the unconstitutional investigatory stop and the evidence seized incident to a lawful arrest. Pp. 4–10.

(a) As the primary judicial remedy for deterring Fourth Amendment violations, the exclusionary rule encompasses both the "primary evidence obtained as a direct result of an illegal search or seizure" and, relevant here, "evidence later discovered and found to be derivative of an illegality." *Segura* v. *United States*, 468 U. S. 796, 804. But to ensure that those deterrence benefits are not outweighed by

the rule's substantial social costs, there are several exceptions to the rule. One exception is the attenuation doctrine, which provides for admissibility when the connection between unconstitutional police conduct and the evidence is sufficiently remote or has been interrupted by some intervening circumstance. See *Hudson* v. *Michigan*, 547 U. S. 586, 593. Pp. 4–5.

(b) As a threshold matter, the attenuation doctrine is not limited to the defendant's independent acts. The doctrine therefore applies here, where the intervening circumstance is the discovery of a valid, pre-existing, and untainted arrest warrant. Assuming, without deciding, that Officer Fackrell lacked reasonable suspicion to stop Strieff initially, the discovery of that arrest warrant attenuated the connection between the unlawful stop and the evidence seized from Strieff incident to his arrest. Pp. 5–10.

(1) Three factors articulated in *Brown* v. *Illinois*, 422 U. S. 590, lead to this conclusion. The first, "temporal proximity" between the initially unlawful stop and the search, *id.,* at 603, favors suppressing the evidence. Officer Fackrell discovered drug contraband on Strieff only minutes after the illegal stop. In contrast, the second factor, "the presence of intervening circumstances, *id.*, at 603–604, strongly favors the State. The existence of a valid warrant, predating the investigation and entirely unconnected with the stop, favors finding sufficient attenuation between the unlawful conduct and the discovery of evidence. That warrant authorized Officer Fackrell to arrest Strieff, and once the arrest was authorized, his search of Strieff incident to that arrest was undisputedly lawful. The third factor, "the purpose and flagrancy of the official misconduct," *id.*, at 604, also strongly favors the State. Officer Fackrell was at most negligent, but his errors in judgment hardly rise to a purposeful or flagrant violation of Strieff's Fourth Amendment rights. After the unlawful stop, his conduct was lawful, and there is no indication that the stop was part of any systemic or recurrent police misconduct. Pp. 6–9.

(2) Strieff's counterarguments are unpersuasive. First, neither Officer Fackrell's purpose nor the flagrancy of the violation rises to a level of misconduct warranting suppression. Officer Fackrell's purpose was not to conduct a suspicionless fishing expedition but was to gather information about activity inside a house whose occupants were legitimately suspected of dealing drugs. Strieff conflates the standard for an illegal stop with the standard for flagrancy, which requires more than the mere absence of proper cause. Second, it is unlikely that the prevalence of outstanding warrants will lead to dragnet searches by police. Such misconduct would expose police to civil liability and, in any event, is already accounted for by *Brown*'s "purpose and flagrancy" factor. Pp. 9–10.

Syllabus

2015 UT 2, 357 P. 3d 532, reversed.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, BREYER, and ALITO, JJ., joined. SOTOMAYOR, J., filed a dissenting opinion, in which GINSBURG, J., joined as to Parts I, II, and III. KAGAN, J., filed a dissenting opinion, in which GINSBURG, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 14–1373

### UTAH, PETITIONER *v.* EDWARD JOSEPH STRIEFF, JR.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF UTAH

[June 20, 2016]

JUSTICE THOMAS delivered the opinion of the Court.

To enforce the Fourth Amendment's prohibition against "unreasonable searches and seizures," this Court has at times required courts to exclude evidence obtained by unconstitutional police conduct. But the Court has also held that, even when there is a Fourth Amendment violation, this exclusionary rule does not apply when the costs of exclusion outweigh its deterrent benefits. In some cases, for example, the link between the unconstitutional conduct and the discovery of the evidence is too attenuated to justify suppression. The question in this case is whether this attenuation doctrine applies when an officer makes an unconstitutional investigatory stop; learns during that stop that the suspect is subject to a valid arrest warrant; and proceeds to arrest the suspect and seize incriminating evidence during a search incident to that arrest. We hold that the evidence the officer seized as part of the search incident to arrest is admissible because the officer's discovery of the arrest warrant attenuated the connection between the unlawful stop and the evidence seized incident to arrest.

I

This case began with an anonymous tip. In December 2006, someone called the South Salt Lake City police's drug-tip line to report "narcotics activity" at a particular residence. App. 15. Narcotics detective Douglas Fackrell investigated the tip. Over the course of about a week, Officer Fackrell conducted intermittent surveillance of the home. He observed visitors who left a few minutes after arriving at the house. These visits were sufficiently frequent to raise his suspicion that the occupants were dealing drugs.

One of those visitors was respondent Edward Strieff. Officer Fackrell observed Strieff exit the house and walk toward a nearby convenience store. In the store's parking lot, Officer Fackrell detained Strieff, identified himself, and asked Strieff what he was doing at the residence.

As part of the stop, Officer Fackrell requested Strieff's identification, and Strieff produced his Utah identification card. Officer Fackrell relayed Strieff's information to a police dispatcher, who reported that Strieff had an outstanding arrest warrant for a traffic violation. Officer Fackrell then arrested Strieff pursuant to that warrant. When Officer Fackrell searched Strieff incident to the arrest, he discovered a baggie of methamphetamine and drug paraphernalia.

The State charged Strieff with unlawful possession of methamphetamine and drug paraphernalia. Strieff moved to suppress the evidence, arguing that the evidence was inadmissible because it was derived from an unlawful investigatory stop. At the suppression hearing, the prosecutor conceded that Officer Fackrell lacked reasonable suspicion for the stop but argued that the evidence should not be suppressed because the existence of a valid arrest warrant attenuated the connection between the unlawful stop and the discovery of the contraband.

The trial court agreed with the State and admitted the

evidence. The court found that the short time between the illegal stop and the search weighed in favor of suppressing the evidence, but that two countervailing considerations made it admissible. First, the court considered the presence of a valid arrest warrant to be an "'extraordinary intervening circumstance.'" App. to Pet. for Cert. 102 (quoting *United States* v. *Simpson*, 439 F. 3d 490, 496 (CA8 2006). Second, the court stressed the absence of flagrant misconduct by Officer Fackrell, who was conducting a legitimate investigation of a suspected drug house.

Strieff conditionally pleaded guilty to reduced charges of attempted possession of a controlled substance and possession of drug paraphernalia, but reserved his right to appeal the trial court's denial of the suppression motion. The Utah Court of Appeals affirmed. 2012 UT App 245, 286 P. 3d 317.

The Utah Supreme Court reversed. 2015 UT 2, 357 P. 3d 532. It held that the evidence was inadmissible because only "a voluntary act of a defendant's free will (as in a confession or consent to search)" sufficiently breaks the connection between an illegal search and the discovery of evidence. *Id.*, at 536. Because Officer Fackrell's discovery of a valid arrest warrant did not fit this description, the court ordered the evidence suppressed. *Ibid.*

We granted certiorari to resolve disagreement about how the attenuation doctrine applies where an unconstitutional detention leads to the discovery of a valid arrest warrant. 576 U. S. ___ (2015). Compare, *e.g., United States* v. *Green*, 111 F. 3d 515, 522–523 (CA7 1997) (holding that discovery of the warrant is a dispositive intervening circumstance where police misconduct was not flagrant), with, *e.g., State* v. *Moralez*, 297 Kan. 397, 415, 300 P. 3d 1090, 1102 (2013) (assigning little significance to the discovery of the warrant). We now reverse.

## II
## A

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Because officers who violated the Fourth Amendment were traditionally considered trespassers, individuals subject to unconstitutional searches or seizures historically enforced their rights through tort suits or self-help. Davies, Recovering the Original Fourth Amendment, 98 Mich. L. Rev. 547, 625 (1999). In the 20th century, however, the exclusionary rule—the rule that often requires trial courts to exclude unlawfully seized evidence in a criminal trial—became the principal judicial remedy to deter Fourth Amendment violations. See, *e.g., Mapp* v. *Ohio*, 367 U. S. 643, 655 (1961).

Under the Court's precedents, the exclusionary rule encompasses both the "primary evidence obtained as a direct result of an illegal search or seizure" and, relevant here, "evidence later discovered and found to be derivative of an illegality," the so-called "'fruit of the poisonous tree.'" *Segura* v. *United States*, 468 U. S. 796, 804 (1984). But the significant costs of this rule have led us to deem it "applicable only . . . where its deterrence benefits outweigh its substantial social costs." *Hudson* v. *Michigan*, 547 U. S. 586, 591 (2006) (internal quotation marks omitted). "Suppression of evidence . . . has always been our last resort, not our first impulse." *Ibid.*

We have accordingly recognized several exceptions to the rule. Three of these exceptions involve the causal relationship between the unconstitutional act and the discovery of evidence. First, the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source. See *Murray* v. *United States*, 487 U. S. 533, 537 (1988). Second, the inevitable

discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source. See *Nix* v. *Williams*, 467 U. S. 431, 443–444 (1984). Third, and at issue here, is the attenuation doctrine: Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Hudson*, *supra,* at 593.

### B

Turning to the application of the attenuation doctrine to this case, we first address a threshold question: whether this doctrine applies at all to a case like this, where the intervening circumstance that the State relies on is the discovery of a valid, pre-existing, and untainted arrest warrant. The Utah Supreme Court declined to apply the attenuation doctrine because it read our precedents as applying the doctrine only "to circumstances involving an independent act of a defendant's 'free will' in confessing to a crime or consenting to a search." 357 P. 3d, at 544. In this Court, Strieff has not defended this argument, and we disagree with it, as well. The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence, which often has nothing to do with a defendant's actions. And the logic of our prior attenuation cases is not limited to independent acts by the defendant.

It remains for us to address whether the discovery of a valid arrest warrant was a sufficient intervening event to break the causal chain between the unlawful stop and the discovery of drug-related evidence on Strieff's person. The three factors articulated in *Brown* v. *Illinois*, 422 U. S. 590 (1975), guide our analysis. First, we look to the "temporal

proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. *Id.,* at 603. Second, we consider "the presence of intervening circumstances." *Id.,* at 603–604. Third, and "particularly" significant, we examine "the purpose and flagrancy of the official misconduct." *Id.,* at 604. In evaluating these factors, we assume without deciding (because the State conceded the point) that Officer Fackrell lacked reasonable suspicion to initially stop Strieff. And, because we ultimately conclude that the warrant breaks the causal chain, we also have no need to decide whether the warrant's existence alone would make the initial stop constitutional even if Officer Fackrell was unaware of its existence.

1

The first factor, temporal proximity between the initially unlawful stop and the search, favors suppressing the evidence. Our precedents have declined to find that this factor favors attenuation unless "substantial time" elapses between an unlawful act and when the evidence is obtained. *Kaupp* v. *Texas,* 538 U. S. 626, 633 (2003) (*per curiam*). Here, however, Officer Fackrell discovered drug contraband on Strieff's person only minutes after the illegal stop. See App. 18–19. As the Court explained in *Brown,* such a short time interval counsels in favor of suppression; there, we found that the confession should be suppressed, relying in part on the "less than two hours" that separated the unconstitutional arrest and the confession. 422 U. S., at 604.

In contrast, the second factor, the presence of intervening circumstances, strongly favors the State. In *Segura,* 468 U. S. 796, the Court addressed similar facts to those here and found sufficient intervening circumstances to allow the admission of evidence. There, agents had probable cause to believe that apartment occupants were deal-

ing cocaine. *Id.,* at 799–800. They sought a warrant. In the meantime, they entered the apartment, arrested an occupant, and discovered evidence of drug activity during a limited search for security reasons. *Id.,* at 800–801. The next evening, the Magistrate Judge issued the search warrant. *Ibid.* This Court deemed the evidence admissible notwithstanding the illegal search because the information supporting the warrant was "wholly unconnected with the [arguably illegal] entry and was known to the agents well before the initial entry." *Id.,* at 814.

*Segura,* of course, applied the independent source doctrine because the unlawful entry "did not contribute in any way to discovery of the evidence seized under the warrant." *Id.,* at 815. But the *Segura* Court suggested that the existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is "sufficiently attenuated to dissipate the taint." *Ibid.* That principle applies here.

In this case, the warrant was valid, it predated Officer Fackrell's investigation, and it was entirely unconnected with the stop. And once Officer Fackrell discovered the warrant, he had an obligation to arrest Strieff. "A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions." *United States* v. *Leon,* 468 U. S. 897, 920, n. 21 (1984) (internal quotation marks omitted). Officer Fackrell's arrest of Strieff thus was a ministerial act that was independently compelled by the pre-existing warrant. And once Officer Fackrell was authorized to arrest Strieff, it was undisputedly lawful to search Strieff as an incident of his arrest to protect Officer Fackrell's safety. See *Arizona* v. *Gant,* 556 U. S. 332, 339 (2009) (explaining the permissible scope of searches incident to arrest).

Finally, the third factor, "the purpose and flagrancy of the official misconduct," *Brown, supra,* at 604, also strongly

favors the State. The exclusionary rule exists to deter police misconduct. *Davis* v. *United States*, 564 U. S. 229, 236–237 (2011). The third factor of the attenuation doctrine reflects that rationale by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant.

Officer Fackrell was at most negligent. In stopping Strieff, Officer Fackrell made two good-faith mistakes. First, he had not observed what time Strieff entered the suspected drug house, so he did not know how long Strieff had been there. Officer Fackrell thus lacked a sufficient basis to conclude that Strieff was a short-term visitor who may have been consummating a drug transaction. Second, because he lacked confirmation that Strieff was a short-term visitor, Officer Fackrell should have asked Strieff whether he would speak with him, instead of demanding that Strieff do so. Officer Fackrell's stated purpose was to "find out what was going on [in] the house." App. 17. Nothing prevented him from approaching Strieff simply to ask. See *Florida* v. *Bostick*, 501 U. S. 429, 434 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions"). But these errors in judgment hardly rise to a purposeful or flagrant violation of Strieff's Fourth Amendment rights.

While Officer Fackrell's decision to initiate the stop was mistaken, his conduct thereafter was lawful. The officer's decision to run the warrant check was a "negligibly burdensome precautio[n]" for officer safety. *Rodriguez* v. *United States*, 575 U. S. ___, ___ (2015) (slip op., at 7). And Officer Fackrell's actual search of Strieff was a lawful search incident to arrest. See *Gant, supra,* at 339.

Moreover, there is no indication that this unlawful stop was part of any systemic or recurrent police misconduct. To the contrary, all the evidence suggests that the stop was an isolated instance of negligence that occurred in connection with a bona fide investigation of a suspected

drug house. Officer Fackrell saw Strieff leave a suspected drug house. And his suspicion about the house was based on an anonymous tip and his personal observations.

Applying these factors, we hold that the evidence discovered on Strieff's person was admissible because the unlawful stop was sufficiently attenuated by the preexisting arrest warrant. Although the illegal stop was close in time to Strieff's arrest, that consideration is outweighed by two factors supporting the State. The outstanding arrest warrant for Strieff's arrest is a critical intervening circumstance that is wholly independent of the illegal stop. The discovery of that warrant broke the causal chain between the unconstitutional stop and the discovery of evidence by compelling Officer Fackrell to arrest Strieff. And, it is especially significant that there is no evidence that Officer Fackrell's illegal stop reflected flagrantly unlawful police misconduct.

2

We find Strieff's counterarguments unpersuasive.

First, he argues that the attenuation doctrine should not apply because the officer's stop was purposeful and flagrant. He asserts that Officer Fackrell stopped him solely to fish for evidence of suspected wrongdoing. But Officer Fackrell sought information from Strieff to find out what was happening inside a house whose occupants were legitimately suspected of dealing drugs. This was not a suspicionless fishing expedition "in the hope that something would turn up." *Taylor* v. *Alabama,* 457 U. S. 687, 691 (1982).

Strieff argues, moreover, that Officer Fackrell's conduct was flagrant because he detained Strieff without the necessary level of cause (here, reasonable suspicion). But that conflates the standard for an illegal stop with the standard for flagrancy. For the violation to be flagrant, more severe police misconduct is required than the mere

absence of proper cause for the seizure.  See, *e.g., Kaupp*, 538 U. S., at 628, 633 (finding flagrant violation where a warrantless arrest was made in the arrestee's home after police were denied a warrant and at least some officers knew they lacked probable cause).  Neither the officer's alleged purpose nor the flagrancy of the violation rise to a level of misconduct to warrant suppression.

Second, Strieff argues that, because of the prevalence of outstanding arrest warrants in many jurisdictions, police will engage in dragnet searches if the exclusionary rule is not applied.  We think that this outcome is unlikely.  Such wanton conduct would expose police to civil liability.  See 42 U. S. C. §1983; *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 690 (1978); see also *Segura*, 468 U. S., at 812.  And in any event, the *Brown* factors take account of the purpose and flagrancy of police misconduct.  Were evidence of a dragnet search presented here, the application of the *Brown* factors could be different.  But there is no evidence that the concerns that Strieff raises with the criminal justice system are present in South Salt Lake City, Utah.

\*    \*    \*

We hold that the evidence Officer Fackrell seized as part of his search incident to arrest is admissible because his discovery of the arrest warrant attenuated the connection between the unlawful stop and the evidence seized from Strieff incident to arrest.  The judgment of the Utah Supreme Court, accordingly, is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–1373

_____

## UTAH, PETITIONER *v.* EDWARD JOSEPH STRIEFF, JR.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF UTAH

[June 20, 2016]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG joins as to Parts I, II, and III, dissenting.

The Court today holds that the discovery of a warrant for an unpaid parking ticket will forgive a police officer's violation of your Fourth Amendment rights. Do not be soothed by the opinion's technical language: This case allows the police to stop you on the street, demand your identification, and check it for outstanding traffic warrants—even if you are doing nothing wrong. If the officer discovers a warrant for a fine you forgot to pay, courts will now excuse his illegal stop and will admit into evidence anything he happens to find by searching you after arresting you on the warrant. Because the Fourth Amendment should prohibit, not permit, such misconduct, I dissent.

I

Minutes after Edward Strieff walked out of a South Salt Lake City home, an officer stopped him, questioned him, and took his identification to run it through a police database. The officer did not suspect that Strieff had done anything wrong. Strieff just happened to be the first person to leave a house that the officer thought might contain "drug activity." App. 16–19.

As the State of Utah concedes, this stop was illegal. App. 24. The Fourth Amendment protects people from "unreasonable searches and seizures." An officer breaches

that protection when he detains a pedestrian to check his license without any evidence that the person is engaged in a crime. *Delaware* v. *Prouse*, 440 U. S. 648, 663 (1979); *Terry* v. *Ohio*, 392 U. S. 1, 21 (1968). The officer deepens the breach when he prolongs the detention just to fish further for evidence of wrongdoing. *Rodriguez* v. *United States*, 575 U. S. ___, ___–___ (2015) (slip op., at 6–7). In his search for lawbreaking, the officer in this case himself broke the law.

The officer learned that Strieff had a "small traffic warrant." App. 19. Pursuant to that warrant, he arrested Strieff and, conducting a search incident to the arrest, discovered methamphetamine in Strieff's pockets.

Utah charged Strieff with illegal drug possession. Before trial, Strieff argued that admitting the drugs into evidence would condone the officer's misbehavior. The methamphetamine, he reasoned, was the product of the officer's illegal stop. Admitting it would tell officers that unlawfully discovering even a "small traffic warrant" would give them license to search for evidence of unrelated offenses. The Utah Supreme Court unanimously agreed with Strieff. A majority of this Court now reverses.

## II

It is tempting in a case like this, where illegal conduct by an officer uncovers illegal conduct by a civilian, to forgive the officer. After all, his instincts, although unconstitutional, were correct. But a basic principle lies at the heart of the Fourth Amendment: Two wrongs don't make a right. See *Weeks* v. *United States*, 232 U. S. 383, 392 (1914). When "lawless police conduct" uncovers evidence of lawless civilian conduct, this Court has long required later criminal trials to exclude the illegally obtained evidence. *Terry*, 392 U. S., at 12; *Mapp* v. *Ohio*, 367 U. S. 643, 655 (1961). For example, if an officer breaks into a home and finds a forged check lying around, that check

may not be used to prosecute the homeowner for bank fraud. We would describe the check as "'fruit of the poisonous tree.'" *Wong Sun* v. *United States*, 371 U. S. 471, 488 (1963). Fruit that must be cast aside includes not only evidence directly found by an illegal search but also evidence "come at by exploitation of that illegality." *Ibid.*

This "exclusionary rule" removes an incentive for officers to search us without proper justification. *Terry*, 392 U. S., at 12. It also keeps courts from being "made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions." *Id.,* at 13. When courts admit only lawfully obtained evidence, they encourage "those who formulate law enforcement polices, and the officers who implement them, to incorporate Fourth Amendment ideals into their value system." *Stone* v. *Powell*, 428 U. S. 465, 492 (1976). But when courts admit illegally obtained evidence as well, they reward "manifest neglect if not an open defiance of the prohibitions of the Constitution." *Weeks*, 232 U. S., at 394.

Applying the exclusionary rule, the Utah Supreme Court correctly decided that Strieff's drugs must be excluded because the officer exploited his illegal stop to discover them. The officer found the drugs only after learning of Strieff's traffic violation; and he learned of Strieff's traffic violation only because he unlawfully stopped Strieff to check his driver's license.

The court also correctly rejected the State's argument that the officer's discovery of a traffic warrant unspoiled the poisonous fruit. The State analogizes finding the warrant to one of our earlier decisions, *Wong Sun* v. *United States*. There, an officer illegally arrested a person who, days later, voluntarily returned to the station to confess to committing a crime. 371 U. S., at 491. Even though the person would not have confessed "but for the illegal actions of the police," *id.,* at 488, we noted that the

police did not exploit their illegal arrest to obtain the confession, *id.,* at 491. Because the confession was obtained by "means sufficiently distinguishable" from the constitutional violation, we held that it could be admitted into evidence. *Id.,* at 488, 491. The State contends that the search incident to the warrant-arrest here is similarly distinguishable from the illegal stop.

But *Wong Sun* explains why Strieff's drugs must be excluded. We reasoned that a Fourth Amendment violation may not color every investigation that follows but it certainly stains the actions of officers who exploit the infraction. We distinguished evidence obtained by innocuous means from evidence obtained by exploiting misconduct after considering a variety of factors: whether a long time passed, whether there were "intervening circumstances," and whether the purpose or flagrancy of the misconduct was "calculated" to procure the evidence. *Brown* v. *Illinois,* 422 U. S. 590, 603–604 (1975).

These factors confirm that the officer in this case discovered Strieff's drugs by exploiting his own illegal conduct. The officer did not ask Strieff to volunteer his name only to find out, days later, that Strieff had a warrant against him. The officer illegally stopped Strieff and immediately ran a warrant check. The officer's discovery of a warrant was not some intervening surprise that he could not have anticipated. Utah lists over 180,000 misdemeanor warrants in its database, and at the time of the arrest, Salt Lake County had a "backlog of outstanding warrants" so large that it faced the "potential for civil liability." See Dept. of Justice, Bureau of Justice Statistics, Survey of State Criminal History Information Systems, 2014 (2015) (Systems Survey) (Table 5a), online at https://www.ncjrs.gov/pdffiles1/bjs/grants/249799.pdf (all Internet materials as last visited June 16, 2016); Inst. for Law and Policy Planning, Salt Lake County Criminal Justice System Assessment 6.7 (2004), online at

http://www.slco.org/cjac/resources/SaltLakeCJSAfinal.pdf. The officer's violation was also calculated to procure evidence. His sole reason for stopping Strieff, he acknowledged, was investigative—he wanted to discover whether drug activity was going on in the house Strieff had just exited. App. 17.

The warrant check, in other words, was not an "intervening circumstance" separating the stop from the search for drugs. It was part and parcel of the officer's illegal "expedition for evidence in the hope that something might turn up." *Brown*, 422 U. S., at 605. Under our precedents, because the officer found Strieff's drugs by exploiting his own constitutional violation, the drugs should be excluded.

## III

### A

The Court sees things differently. To the Court, the fact that a warrant gives an officer cause to arrest a person severs the connection between illegal policing and the resulting discovery of evidence. *Ante,* at 7. This is a remarkable proposition: The mere existence of a warrant not only gives an officer legal cause to arrest and search a person, it also forgives an officer who, with no knowledge of the warrant at all, unlawfully stops that person on a whim or hunch.

To explain its reasoning, the Court relies on *Segura* v. *United States*, 468 U. S. 796 (1984). There, federal agents applied for a warrant to search an apartment but illegally entered the apartment to secure it before the judge issued the warrant. *Id.,* at 800–801. After receiving the warrant, the agents then searched the apartment for drugs. *Id.,* at 801. The question before us was what to do with the evidence the agents then discovered. We declined to suppress it because "[t]he illegal entry into petitioners' apartment did not contribute in any way to discovery of the evidence seized under the warrant." *Id.,* at 815.

According to the majority, *Segura* involves facts "similar" to this case and "suggest[s]" that a valid warrant will clean up whatever illegal conduct uncovered it. *Ante,* at 6–7. It is difficult to understand this interpretation. In *Segura*, the agents' illegal conduct in entering the apartment had nothing to do with their procurement of a search warrant. Here, the officer's illegal conduct in stopping Strieff was essential to his discovery of an arrest warrant. *Segura* would be similar only if the agents used information they illegally obtained from the apartment to procure a search warrant or discover an arrest warrant. Precisely because that was not the case, the Court admitted the untainted evidence. 468 U. S., at 814.

The majority likewise misses the point when it calls the warrant check here a "'negligibly burdensome precautio[n]'" taken for the officer's "safety." *Ante,* at 8 (quoting *Rodriguez*, 575 U. S., at ___ (slip op., at 7)). Remember, the officer stopped Strieff without suspecting him of committing any crime. By his own account, the officer did not fear Strieff. Moreover, the safety rationale we discussed in *Rodriguez*, an opinion about highway patrols, is conspicuously absent here. A warrant check on a highway "ensur[es] that vehicles on the road are operated safely and responsibly." *Id.*, at ___ (slip op., at 6). We allow such checks during legal traffic stops because the legitimacy of a person's driver's license has a "close connection to roadway safety." *Id.,* at ___ (slip op., at 7). A warrant check of a pedestrian on a sidewalk, "by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Ibid.* (quoting *Indianapolis* v. *Edmond*, 531 U. S. 32, 40–41 (2000)). Surely we would not allow officers to warrant-check random joggers, dog walkers, and lemonade vendors just to ensure they pose no threat to anyone else.

The majority also posits that the officer could not have exploited his illegal conduct because he did not violate the Fourth Amendment on purpose. Rather, he made "good-

faith mistakes." *Ante,* at 8. Never mind that the officer's sole purpose was to fish for evidence. The majority casts his unconstitutional actions as "negligent" and therefore incapable of being deterred by the exclusionary rule. *Ibid.*

But the Fourth Amendment does not tolerate an officer's unreasonable searches and seizures just because he did not know any better. Even officers prone to negligence can learn from courts that exclude illegally obtained evidence. *Stone*, 428 U. S., at 492. Indeed, they are perhaps the most in need of the education, whether by the judge's opinion, the prosecutor's future guidance, or an updated manual on criminal procedure. If the officers are in doubt about what the law requires, exclusion gives them an "incentive to err on the side of constitutional behavior." *United States* v. *Johnson*, 457 U. S. 537, 561 (1982).

## B

Most striking about the Court's opinion is its insistence that the event here was "isolated," with "no indication that this unlawful stop was part of any systemic or recurrent police misconduct." *Ante*, at 8–9. Respectfully, nothing about this case is isolated.

Outstanding warrants are surprisingly common. When a person with a traffic ticket misses a fine payment or court appearance, a court will issue a warrant. See, *e.g.,* Brennan Center for Justice, Criminal Justice Debt 23 (2010), online at https://www.brennancenter.org/sites/default/ files/legacy/Fees%20and%20Fines%20FINAL.pdf. When a person on probation drinks alcohol or breaks curfew, a court will issue a warrant. See, *e.g.,* Human Rights Watch, Profiting from Probation 1, 51 (2014), online at https: //www.hrw.org/report/2014/02/05 /profiting-probation/ americas-offender-funded-probation-industry. The States and Federal Government maintain databases with over 7.8 million outstanding warrants, the vast majority of which appear to be for minor offenses. See Systems Sur-

vey (Table 5a). Even these sources may not track the "staggering" numbers of warrants, "'drawers and drawers'" full, that many cities issue for traffic violations and ordinance infractions. Dept. of Justice, Civil Rights Div., Investigation of the Ferguson Police Department 47, 55 (2015) (Ferguson Report), online at https://www.justice.gov/ sites/default/files/opa/press-releases/attachments/2015/03/ 04/ferguson_police_department_report.pdf. The county in this case has had a "backlog" of such warrants. See *supra,* at 4. The Department of Justice recently reported that in the town of Ferguson, Missouri, with a population of 21,000, 16,000 people had outstanding warrants against them. Ferguson Report, at 6, 55.

Justice Department investigations across the country have illustrated how these astounding numbers of warrants can be used by police to stop people without cause. In a single year in New Orleans, officers "made nearly 60,000 arrests, of which about 20,000 were of people with outstanding traffic or misdemeanor warrants from neighboring parishes for such infractions as unpaid tickets." Dept. of Justice, Civil Rights Div., Investigation of the New Orleans Police Department 29 (2011), online at https://www.justice.gov/sites/default/files/crt/legacy/2011/ 03/17/nopd_report.pdf. In the St. Louis metropolitan area, officers "routinely" stop people—on the street, at bus stops, or even in court—for no reason other than "an officer's desire to check whether the subject had a municipal arrest warrant pending." Ferguson Report, at 49, 57. In Newark, New Jersey, officers stopped 52,235 pedestrians within a 4-year period and ran warrant checks on 39,308 of them. Dept. of Justice, Civil Rights Div., Investigation of the Newark Police Department 8, 19, n. 15 (2014), online at https: // www.justice.gov/sites/default/files/crt/ legacy/2014/07/22/newark_findings_7-22-14.pdf. The Justice Department analyzed these warrant-checked stops and reported that "approximately 93% of the stops would

have been considered unsupported by articulated reasonable suspicion." *Id.,* at 9, n. 7.

I do not doubt that most officers act in "good faith" and do not set out to break the law. That does not mean these stops are "isolated instance[s] of negligence," however. *Ante,* at 8. Many are the product of institutionalized training procedures. The New York City Police Department long trained officers to, in the words of a District Judge, "stop and question first, develop reasonable suspicion later." *Ligon* v. *New York*, 925 F. Supp. 2d 478, 537–538 (SDNY), stay granted on other grounds, 736 F. 3d 118 (CA2 2013). The Utah Supreme Court described as "'routine procedure' or 'common practice'" the decision of Salt Lake City police officers to run warrant checks on pedestrians they detained without reasonable suspicion. *State* v. *Topanotes*, 2003 UT 30, ¶2, 76 P. 3d 1159, 1160. In the related context of traffic stops, one widely followed police manual instructs officers looking for drugs to "run at least a warrants check on all drivers you stop. Statistically, narcotics offenders are . . . more likely to fail to appear on simple citations, such as traffic or trespass violations, leading to the issuance of bench warrants. Discovery of an outstanding warrant gives you cause for an immediate custodial arrest and search of the suspect." C. Remsberg, Tactics for Criminal Patrol 205–206 (1995); C. Epp et al., Pulled Over 23, 33–36 (2014).

The majority does not suggest what makes this case "isolated" from these and countless other examples. Nor does it offer guidance for how a defendant can prove that his arrest was the result of "widespread" misconduct. Surely it should not take a federal investigation of Salt Lake County before the Court would protect someone in Strieff's position.

## IV

Writing only for myself, and drawing on my professional

experiences, I would add that unlawful "stops" have severe consequences much greater than the inconvenience suggested by the name. This Court has given officers an array of instruments to probe and examine you. When we condone officers' use of these devices without adequate cause, we give them reason to target pedestrians in an arbitrary manner. We also risk treating members of our communities as second-class citizens.

Although many Americans have been stopped for speeding or jaywalking, few may realize how degrading a stop can be when the officer is looking for more. This Court has allowed an officer to stop you for whatever reason he wants—so long as he can point to a pretextual justification after the fact. *Whren* v. *United States*, 517 U. S. 806, 813 (1996). That justification must provide specific reasons why the officer suspected you were breaking the law, *Terry*, 392 U. S., at 21, but it may factor in your ethnicity, *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 886–887 (1975), where you live, *Adams* v. *Williams*, 407 U. S. 143, 147 (1972), what you were wearing, *United States* v. *Sokolow*, 490 U. S. 1, 4–5 (1989), and how you behaved, *Illinois* v. *Wardlow*, 528 U. S. 119, 124–125 (2000). The officer does not even need to know which law you might have broken so long as he can later point to any possible infraction—even one that is minor, unrelated, or ambiguous. *Devenpeck* v. *Alford*, 543 U. S. 146, 154–155 (2004); *Heien* v. *North Carolina*, 574 U. S. ___ (2014).

The indignity of the stop is not limited to an officer telling you that you look like a criminal. See Epp, Pulled Over, at 5. The officer may next ask for your "consent" to inspect your bag or purse without telling you that you can decline. See *Florida* v. *Bostick*, 501 U. S. 429, 438 (1991). Regardless of your answer, he may order you to stand "helpless, perhaps facing a wall with [your] hands raised." *Terry*, 392 U. S., at 17. If the officer thinks you might be dangerous, he may then "frisk" you for weapons. This

involves more than just a pat down. As onlookers pass by, the officer may "'feel with sensitive fingers every portion of [your] body. A thorough search [may] be made of [your] arms and armpits, waistline and back, the groin and area about the testicles, and entire surface of the legs down to the feet.'" *Id.,* at 17, n. 13.

The officer's control over you does not end with the stop. If the officer chooses, he may handcuff you and take you to jail for doing nothing more than speeding, jaywalking, or "driving [your] pickup truck . . . with [your] 3-year-old son and 5-year-old daughter . . . without [your] seatbelt fastened." *Atwater* v. *Lago Vista*, 532 U. S. 318, 323–324 (2001). At the jail, he can fingerprint you, swab DNA from the inside of your mouth, and force you to "shower with a delousing agent" while you "lift [your] tongue, hold out [your] arms, turn around, and lift [your] genitals." *Florence* v. *Board of Chosen Freeholders of County of Burlington*, 566 U. S. \_\_\_, \_\_\_–\_\_\_ (2012) (slip op., at 2–3); *Maryland* v. *King*, 569 U. S. \_\_\_, \_\_\_ (2013) (slip op., at 28). Even if you are innocent, you will now join the 65 million Americans with an arrest record and experience the "civil death" of discrimination by employers, landlords, and whoever else conducts a background check. Chin, The New Civil Death, 160 U. Pa. L. Rev. 1789, 1805 (2012); see J. Jacobs, The Eternal Criminal Record 33–51 (2015); Young & Petersilia, Keeping Track, 129 Harv. L. Rev. 1318, 1341–1357 (2016). And, of course, if you fail to pay bail or appear for court, a judge will issue a warrant to render you "arrestable on sight" in the future. A. Goffman, On the Run 196 (2014).

This case involves a *suspicionless* stop, one in which the officer initiated this chain of events without justification. As the Justice Department notes, *supra*, at 8, many innocent people are subjected to the humiliations of these unconstitutional searches. The white defendant in this case shows that anyone's dignity can be violated in this

manner. See M. Gottschalk, Caught 119–138 (2015). But it is no secret that people of color are disproportionate victims of this type of scrutiny. See M. Alexander, The New Jim Crow 95–136 (2010). For generations, black and brown parents have given their children "the talk"—instructing them never to run down the street; always keep your hands where they can be seen; do not even think of talking back to a stranger—all out of fear of how an officer with a gun will react to them. See, *e.g.,* W. E. B. Du Bois, The Souls of Black Folk (1903); J. Baldwin, The Fire Next Time (1963); T. Coates, Between the World and Me (2015).

By legitimizing the conduct that produces this double consciousness, this case tells everyone, white and black, guilty and innocent, that an officer can verify your legal status at any time. It says that your body is subject to invasion while courts excuse the violation of your rights. It implies that you are not a citizen of a democracy but the subject of a carceral state, just waiting to be cataloged.

We must not pretend that the countless people who are routinely targeted by police are "isolated." They are the canaries in the coal mine whose deaths, civil and literal, warn us that no one can breathe in this atmosphere. See L. Guinier & G. Torres, The Miner's Canary 274–283 (2002). They are the ones who recognize that unlawful police stops corrode all our civil liberties and threaten all our lives. Until their voices matter too, our justice system will continue to be anything but.

\*      \*      \*

I dissent.

# SUPREME COURT OF THE UNITED STATES

_____

### No. 14–1373

_____

## UTAH, PETITIONER *v.* EDWARD JOSEPH STRIEFF, JR.

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF UTAH

[June 20, 2016]

JUSTICE KAGAN, with whom JUSTICE GINSBURG joins, dissenting.

If a police officer stops a person on the street without reasonable suspicion, that seizure violates the Fourth Amendment. And if the officer pats down the unlawfully detained individual and finds drugs in his pocket, the State may not use the contraband as evidence in a criminal prosecution. That much is beyond dispute. The question here is whether the prohibition on admitting evidence dissolves if the officer discovers, after making the stop but before finding the drugs, that the person has an outstanding arrest warrant. Because that added wrinkle makes no difference under the Constitution, I respectfully dissent.

This Court has established a simple framework for determining whether to exclude evidence obtained through a Fourth Amendment violation: Suppression is necessary when, but only when, its societal benefits outweigh its costs. See *ante,* at 4; *Davis* v. *United States*, 564 U. S. 229, 237 (2011). The exclusionary rule serves a crucial function—to deter unconstitutional police conduct. By barring the use of illegally obtained evidence, courts reduce the temptation for police officers to skirt the Fourth Amendment's requirements. See *James* v. *Illinois*, 493 U. S. 307, 319 (1990). But suppression of evidence also "exacts a heavy toll": Its consequence in many cases is to release a criminal without just punishment. *Davis,* 564

U. S., at 237. Our decisions have thus endeavored to strike a sound balance between those two competing considerations—rejecting the "reflexive" impulse to exclude evidence every time an officer runs afoul of the Fourth Amendment, *id.,* at 238, but insisting on suppression when it will lead to "appreciable deterrence" of police misconduct, *Herring* v. *United States*, 555 U. S. 135, 141 (2009).

This case thus requires the Court to determine whether excluding the fruits of Officer Douglas Fackrell's unjustified stop of Edward Strieff would significantly deter police from committing similar constitutional violations in the future. And as the Court states, that inquiry turns on application of the "attenuation doctrine," *ante,* at 5—our effort to "mark the point" at which the discovery of evidence "become[s] so attenuated" from the police misconduct that the deterrent benefit of exclusion drops below its cost. *United States* v. *Leon*, 468 U. S. 897, 911 (1984). Since *Brown* v. *Illinois*, 422 U. S. 590, 604–605 (1975), three factors have guided that analysis. First, the closer the "temporal proximity" between the unlawful act and the discovery of evidence, the greater the deterrent value of suppression. *Id.,* at 603. Second, the more "purpose[ful]" or "flagran[t]" the police illegality, the clearer the necessity, and better the chance, of preventing similar misbehavior. *Id.,* at 604. And third, the presence (or absence) of "intervening circumstances" makes a difference: The stronger the causal chain between the misconduct and the evidence, the more exclusion will curb future constitutional violations. *Id.,* at 603–604. Here, as shown below, each of those considerations points toward suppression: Nothing in Fackrell's discovery of an outstanding warrant so attenuated the connection between his wrongful behavior and his detection of drugs as to diminish the exclusionary rule's deterrent benefits.

Start where the majority does: The temporal proximity

factor, it forthrightly admits, "favors suppressing the evidence." *Ante,* at 6. After all, Fackrell's discovery of drugs came just minutes after the unconstitutional stop. And in prior decisions, this Court has made clear that only the lapse of "substantial time" between the two could favor admission. *Kaupp* v. *Texas*, 538 U. S. 626, 633 (2003) (*per curiam*); see, *e.g., Brown*, 422 U. S., at 604 (suppressing a confession when "less than two hours" separated it from an unlawful arrest). So the State, by all accounts, takes strike one.

Move on to the purposefulness of Fackrell's conduct, where the majority is less willing to see a problem for what it is. The majority chalks up Fackrell's Fourth Amendment violation to a couple of innocent "mistakes." *Ante,* at 8. But far from a Barney Fife-type mishap, Fackrell's seizure of Strieff was a calculated decision, taken with so little justification that the State has never tried to defend its legality. At the suppression hearing, Fackrell acknowledged that the stop was designed for investigatory purposes—*i.e.,* to "find out what was going on [in] the house" he had been watching, and to figure out "what [Strieff] was doing there." App. 17–18. And Fackrell frankly admitted that he had no basis for his action except that Strieff "was coming out of the house." *Id.,* at 17. Plug in Fackrell's and Strieff's names, substitute "stop" for "arrest" and "reasonable suspicion" for "probable cause," and this Court's decision in *Brown* perfectly describes this case:

> "[I]t is not disputed that [Fackrell stopped Strieff] without [reasonable suspicion]. [He] later testified that [he] made the [stop] for the purpose of questioning [Strieff] as part of [his] investigation . . . . The illegality here . . . had a quality of purposefulness. The impropriety of the [stop] was obvious. [A]wareness of that fact was virtually conceded by [Fackrell] when

> [he] repeatedly acknowledged, in [his] testimony, that the purpose of [his] action was 'for investigation': [Fackrell] embarked upon this expedition for evidence in the hope that something might turn up."  422 U. S., at 592, 605 (some internal punctuation altered; footnote, citation, and paragraph break omitted).

In *Brown*, the Court held those facts to support suppression—and they do here as well.  Swing and a miss for strike two.

Finally, consider whether any intervening circumstance "br[oke] the causal chain" between the stop and the evidence.  *Ante,* at 6.  The notion of such a disrupting event comes from the tort law doctrine of proximate causation.  See *Bridge* v. *Phoenix Bond & Indemnity Co.*, 553 U. S. 639, 658–659 (2008) (explaining that a party cannot "establish[] proximate cause" when "an intervening cause break[s] the chain of causation between" the act and the injury); Kerr, Good Faith, New Law, and the Scope of the Exclusionary Rule, 99 Geo. L. J. 1077, 1099 (2011) (Fourth Amendment attenuation analysis "looks to whether the constitutional violation was the proximate cause of the discovery of the evidence").  And as in the tort context, a circumstance counts as intervening only when it is unforeseeable—not when it can be seen coming from miles away.  See W. Keeton, D. Dobbs, B. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 312 (5th ed. 1984).  For rather than breaking the causal chain, predictable effects (*e.g.,* X leads naturally to Y leads naturally to Z) are its very links.

And Fackrell's discovery of an arrest warrant—the only event the majority thinks intervened—was an eminently foreseeable consequence of stopping Strieff.  As Fackrell testified, checking for outstanding warrants during a stop is the "normal" practice of South Salt Lake City police.  App. 18; see also *State* v. *Topanotes*, 2003 UT 30, ¶2, 76 P. 3d 1159, 1160 (describing a warrant check as "routine

procedure" and "common practice" in Salt Lake City). In other words, the department's standard detention procedures—stop, ask for identification, run a check—are partly designed to find outstanding warrants. And find them they will, given the staggering number of such warrants on the books. See generally *ante,* at 7–8 (SOTOMAYOR, J., dissenting). To take just a few examples: The State of California has 2.5 million outstanding arrest warrants (a number corresponding to about 9% of its adult population); Pennsylvania (with a population of about 12.8 million) contributes 1.4 million more; and New York City (population 8.4 million) adds another 1.2 million. See Reply Brief 8; Associated Press, Pa. Database, NBC News (Apr. 8, 2007), online at http://goo.gl/3Yq3Nd (as last visited June 17, 2016); N. Y. Times, Oct. 8, 2015, p. A24.[1] So outstanding warrants do not appear as bolts from the blue. They are the run-of-the-mill results of police stops— what officers look for when they run a routine check of a person's identification and what they know will turn up with fair regularity. In short, they are nothing like what intervening circumstances are supposed to be.[2] Strike

————————

[1] What is more, outstanding arrest warrants are not distributed evenly across the population. To the contrary, they are concentrated in cities, towns, and neighborhoods where stops are most likely to occur— and so the odds of any given stop revealing a warrant are even higher than the above numbers indicate. One study found, for example, that Cincinnati, Ohio had over 100,000 outstanding warrants with only 300,000 residents. See Helland & Tabarrok, The Fugitive: Evidence on Public Versus Private Law Enforcement from Bail Jumping, 47 J. Law & Econ. 93, 98 (2004). And as JUSTICE SOTOMAYOR notes, 16,000 of the 21,000 people residing in the town of Ferguson, Missouri have outstanding warrants. See *ante,* at 8.

[2] The majority relies on *Segura* v. *United States*, 468 U. S. 796 (1984), to reach the opposite conclusion, see *ante,* at 6–7, but that decision lacks any relevance to this case. The Court there held that the Fourth Amendment violation at issue "did not contribute in any way" to the police's subsequent procurement of a warrant and discovery of contraband. 468 U. S., at 815. So the Court had no occasion to consider the

three.

The majority's misapplication of *Brown*'s three-part inquiry creates unfortunate incentives for the police— indeed, practically invites them to do what Fackrell did here. Consider an officer who, like Fackrell, wishes to stop someone for investigative reasons, but does not have what a court would view as reasonable suspicion. If the officer believes that any evidence he discovers will be inadmissible, he is likely to think the unlawful stop not worth making—precisely the deterrence the exclusionary rule is meant to achieve. But when he is told of today's decision? Now the officer knows that the stop may well yield admissible evidence: So long as the target is one of the many millions of people in this country with an outstanding arrest warrant, anything the officer finds in a search is fair game for use in a criminal prosecution. The officer's incentive to violate the Constitution thus increases: From here on, he sees potential advantage in stopping individuals without reasonable suspicion—exactly the temptation the exclusionary rule is supposed to remove. Because the majority thus places Fourth Amendment protections at risk, I respectfully dissent.

---

question here: What happens when an unconstitutional act in fact leads to a warrant which then leads to evidence?