# IN THE SUPREME COURT OF THE STATE OF NEVADA

RALPH TORRES,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 61946

**FILED**

SEP 2 6 2018

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY S. Young
DEPUTY CLERK

## *CORRECTED ORDER OF AFFIRMANCE*

Appellant Ralph Torres appeals from his judgment of conviction, pursuant to a guilty plea, of felon in possession of a firearm. Fourth Judicial District Court, Elko County; Nancy L. Porter, Judge. After an evidentiary hearing, the district court denied Torres's motion to suppress evidence of the firearm discovered in a search incident to arrest, finding that an outstanding arrest warrant was a sufficient intervening circumstance to attenuate the taint of Torres's purported unlawful detention. We affirm.

We previously reversed the judgment of conviction, holding that the attenuation doctrine stated in *Brown v. Illinois*, 422 U.S. 590 (1975), did not apply because the discovery of an arrest warrant does not originate in an "act of free will" by the defendant. *Torres v. State*, 131 Nev., Adv. Op. 2, 341 P.3d 652, 658 n.6 (2015). But in *Utah v. Strieff*, 136 S. Ct. 2056, 2061-63 (2016), the Supreme Court applied *Brown*'s three-factor attenuation test to hold that "the discovery of a valid arrest warrant was a sufficient intervening event to break the causal chain between [an] unlawful stop and the discovery of drug-related evidence on [the defendant's] person." The Supreme Court then granted certiorari, vacated our decision, and remanded this case "for further consideration in light of *Utah v. Strieff*." *Nevada v. Torres*, 136 S. Ct. 2505 (2016). Concluding that the record was insufficient

to determine if *Strieff* controlled or was distinguishable, we ordered a limited remand for a further evidentiary hearing and factual findings on the legality of Torres's detention and the third of the *Brown* attenuation factors. *See Torres v. State*, Docket No. 61946 (Order, January 22, 2018).

The proceedings on limited remand demonstrate that *Strieff* cannot be distinguished and requires us to affirm. In both *Strieff* and this case, a police officer stopped a pedestrian, questioned him, asked to see his identification, then took and kept the identification for between three and five minutes while the officer ran the identification through a police database. *See Strieff*, 136 S. Ct. at 2060. In both cases, the records check turned up an outstanding arrest warrant. *Id.* And in both cases, the officer arrested the defendant pursuant to the warrant, conducted a search incident to arrest, and found evidence of contraband (*Strieff*) or a concealed weapon (*Torres*), for the illegal possession of which the pedestrian/defendant was charged and conditionally pleaded guilty, reserving the right to challenge the trial court's denial of the suppression motion. *Id.*

The case for suppression in *Strieff* was, if anything, stronger than here. In *Strieff*, the State conceded that the police officer, Officer Fackrell, acted illegally when he stopped Strieff and took and kept his identification without reasonable suspicion or consent. *Id.* at 2063. This made Officer Fackrell's seizure of Strieff illegal from the start, through the time it took to verify Strieff's license, until Officer Fackrell discovered Strieff's outstanding warrant and arrested him. *Id.* at 2062-63. In this case, by contrast, the initial stop was legal both because, as the district court found, it was consensual and because Officer Shelley, the arresting officer, had reasonable suspicion that Torres was underage and publicly intoxicated, alone, after midnight. These facts gave Officer Shelley

reasonable suspicion to stop Torres and ask to see his identification to verify his age, justification the arresting officer in *Strieff*, Officer Fackrell, did not have. The illegality claimed was that Officer Shelley did not have cause to detain Torres for the three to five minutes it took to call in a records check, since his driver's license showed he was 29, over the drinking age.

The *Brown* attenuation doctrine comprises three factors: first, the reviewing court assesses the "'temporal proximity' between the unconstitutional conduct and the discovery of [the] evidence" sought to be suppressed; second, the court considers "'the presence of intervening circumstances'"; and third, "and 'particularly' significant, we examine 'the purpose and flagrancy of the official misconduct.'" *Id.* at 2061-62 (quoting *Brown*, 422 U.S. at 603-604).

Applying these factors, *Strieff* held that "[t]he first factor, temporal proximity between the initially unlawful stop and the search, favors suppressing the evidence." *Id.* at 2062. Applying the second factor, the Court deemed the discovery of the warrant, despite the illegality of the initial stop and thus, the subsequent license-check detention, an intervening circumstance that "strongly favors the State." *Id.*

> [T]he warrant was valid, it predated Officer Fackrell's investigation, and it was entirely unconnected with the stop. And once Officer Fackrell discovered the warrant, he had an obligation to arrest Strieff. "A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions." *United States v. Leon,* 468 U.S. 897, 920, n. 21 . . . (1984) (internal quotation marks omitted). Officer Fackrell's arrest of Strieff thus was a ministerial act that was independently compelled by the pre-existing warrant. And once Officer Fackrell was authorized to arrest Strieff, it was undisputedly lawful to search Strieff as an



incident of his arrest to protect Officer Fackrell's safety.

*Id.* at 2062-63. This left the third factor: the purpose and flagrancy of the police misconduct.

The record in *Strieff* established that it was standard practice for the Salt Lake City police to run records checks on identification received during pedestrian stops. *See id.* at 2073 (Kagan, J., dissenting). To the *Strieff* dissenters, this fact, combined with the concededly illegal stop, supported Strieff's argument that Officer Fackrell's detention of him to run a records check on his identification involved a "fishing expedition" or dragnet operation, amounting to "flagrant" or "purposeful" police misconduct. *Id.* at 2064; *see* 2072, 2074 (Kagan, J., dissenting); *see also id.* at 2066-69 (Sotomayor, J., dissenting). The majority disagreed:

> Strieff argues . . . that Officer Fackrell's conduct was flagrant because he detained Strieff without the necessary level of cause (here, reasonable suspicion). *But that conflates the standard for an illegal stop with the standard for flagrancy. For the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure. See, e.g., Kaupp,* 538 U.S. [626], 628, 633 [(2003)] (finding flagrant violation where a warrantless arrest was made in the arrestee's home after police were denied a warrant and at least some officers knew they lacked probable cause). Neither the officer's alleged purpose nor the flagrancy of the violation rise to a level of misconduct to warrant suppression.

*Id.* at 2064 (emphasis added). Concluding, *Strieff* dismissed "[t]he officer's decision to run the warrant check [as] a 'negligibly burdensome precaution' for officer safety," *id.* at 2063 (citing *Rodriguez v. United States*, 135 S. Ct. 1609, 1616 (2015), a traffic stop case), and reversed the Utah Supreme Court's decision to suppress the evidence.

The same *Brown* attenuation-factor analysis in *Strieff* applies here. If Torres was unlawfully detained, that detention began when Officer Shelley kept Torres's ID to run a background check. As in *Strieff*, this took less than five minutes, so the first factor, "temporal proximity," favors Torres. *See id.* at 2062 (recognizing that discovery of contraband only minutes after an illegal stop favored suppression). But the discovery of a valid arrest warrant, which warrant predated and was entirely unrelated to the assertedly unlawful seizure of Torres, is an intervening circumstance that "strongly favors the State." *Id.* at 2062-63 (the arrest "was a ministerial act that was independently compelled by the pre-existing warrant . . . [and] it was undisputedly lawful to search [the defendant] as an incident of his arrest to protect [officer] safety"). So, the question becomes whether the record establishes "purposeful" or "flagrant" police misconduct. Under *Strieff*, it does not.

Unlike Officer Fackrell, Officer Shelley legally made initial contact with Torres. He suspected Torres had been drinking and was not of drinking age. When Officer Shelley confronted Torres, his suspicions were confirmed: Officer Shelley smelled alcohol and judged Torres by his physical appearance to be between 18 and 21. At this point, Officer Shelley asked Torres for his license to verify his age. Although the license showed Torres's age was 29, Officer Shelley still ran the license to verify it. The district court found, and the record from the two evidentiary hearings conducted in this case establishes, that it was

> Sgt. Shelley's standard practice, and "our protocol," to run a person's identification through dispatch when he contacts someone in an investigatory manner and "feels" or "suspects" a crime is being committed. This is what he was trained to do by his field training officer. He does not ask for identification from everyone he encounters. He was also trained to run identification for someone with

SUPREME COURT
OF
NEVADA

(O) 1947A

5

an ID that indicates the person is over 21, but who appears to be under 21.

The district judge found Officer Shelley credible.

On this record, it is debatable whether Officer Shelley illegally seized Torres when he took and kept his license for the time it took to run a records check. But we need not decide that question because, even assuming an illegal seizure occurred, the seizure did not under *Strieff* amount to "flagrant" or "purposeful" police misconduct that would support suppression. The most that can be said is that, like Officer Fackrell in *Strieff*, Officer Shelley and his office had a standard practice of calling in records checks on identification obtained in a *Terry* stop. *Strieff* holds that this does not constitute "purposeful" or "flagrant" misconduct for purposes of the third *Brown* attenuation factor. There are no facts that allow us to distinguish *Strieff*. As Torres based his motion to suppress on federal, not state constitutional law, we are bound by *Strieff* and therefore

ORDER the judgment of the district court AFFIRMED.

_____, J.
Gibbons

_____, J.
Pickering

_____, J.
Hardesty

_____, J.
Parraguirre

cc:    Hon. Nancy L. Porter, District Judge
Las Vegas Defense Group, LLC
Attorney General/Carson City
Elko County District Attorney
Elko County Clerk

STIGLICH, J., concurring in part and dissenting in part:

I agree with the majority that the evidence should not be suppressed pursuant to federal constitutional law as interpreted in *Utah v. Strieff*, 579 U.S. ___, 136 S. Ct. 2505 (2016). However, the Nevada Constitution may afford *additional* protections beyond those provided by the U.S. Constitution. Therefore, I would request further briefing as to the scope and application of the attenuation doctrine in circumstances such as these, pursuant to our state constitution.

_____, J.
Stiglich

DOUGLAS, C.J., with whom CHERRY, J., agrees dissenting:

The Fourth and Fourteenth Amendments require the exclusion from evidence of information, tangible evidence seized, that is obtained as the fruit of an officer's illegal detention where the officer knew or should have known the detention was without probable cause and unconstitutional.

All Fourth Amendment violations are, by Constitutional definition, "unreasonable." The Fourth Amendments protects "(t)he right of the people to be secure in their persons, houses, papers, and efforts, against unreasonable searches and seizures."

The stop of Ralph Torres was occasioned at night when Officer Jeremy Shelly observed a smaller male wearing a sweatshirt with the hood pulled over his head walk over the bridge near 5th Street in Elko, Nevada. Officer Shelly observed Torres sway and stagger as he walked along the bridge, and he thought that Torres might be intoxicated and not old enough to be out past curfew.

Officer Shelly then parked his patrol car in a store parking lot at the end of the bridge and made contact with Torres as he came over the bridge. Officer Shelly told Torres that he stopped him because he was concerned that Torres was too young to be out after curfew and that he had been drinking, and he asked Torres for his ID card. Neither the lights nor siren on the patrol car were engaged. Torres gave Officer Shelly his California ID card, which revealed that Torres was old enough to be out past curfew. After reading Torres's ID card, Officer Shelley transmitted Torres's information to police dispatch for verification and to check for arrest warrants. According to Officer Shelley, it is his standard practice to verify the identification information of every person he encounters because police

officers are often given identification cards that are fake or contain inaccurate information.

The impropriety of the detention was obvious: awareness of that fact is virtually conceded by Officer Shelley when he acknowledged in his testimony that his practice is to verify information of *every* person he encounters; thus, the stops are for investigation or for questioning and are by design and in execution investigatory. Thus, the officer embarked upon this expedition for evidence in hope that something might turn up. The manner of the officer's conduct should have been viewed as calculated and purposeful, thus illegal under the Fourth Amendment and its fruits inadmissible.

The workings of the human mind are too complex and the possibilities of misconduct too diverse to permit the Fourth Amendment to be violated based upon purposeful misconduct of the pretextual stop. The facts, not the pretext, should have received attention as great as the review given to the application of the attenuation doctrine in these circumstances.

_____, C.J.
Douglas

I concur:

_____, J.
Cherry