J-S21006-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JAMEL ROBINSON | |
| Appellant | No. 3698 EDA 2017 |

Appeal from the Judgment of Sentence Entered October 26, 2017
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: 0000668-2015

BEFORE:  STABILE, MURRAY, JJ., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY STABILE, J.:  **FILED JULY 19, 2019**

Appellant, Jamel Robinson, appeals from the October 26, 2017 judgment of sentence imposing an aggregate ten to twenty years of incarceration followed by five years of probation for robbery, three violations of the Uniform Firearms Act, and possession of an instrument of crime.[1]  We affirm.

On the morning of August 2, 2014, a gunpoint robbery occurred in a laundromat on Germantown Avenue in Philadelphia.   N.T. Suppression, 1/26/16, at 8.  Lauren McClay was counting cash in the laundromat's office when a black man wearing a red hoodie and black pants, with a black and red scarf concealing most of his face, entered the office, pointed a gun at her, and

---

[1] 18 Pa.C.S.A. §§ 3701, 6105, 6106, 6108, and 907, respectively.

demanded the money. *Id.* at 11-12. McClay handed over more than $280.00 in cash and the robber fled. *Id.* at 25. McClay immediately called police, described the robber, and informed police he fled on West Rittenhouse Street. *Id.* at 13, 26.

Within one minute, Officer Chad Jeter responded to the area in a marked police car searching for suspects matching the above description. N.T. Suppression Hearing, 1/29/16, at 6-7.[2] Officer Jeter, while proceeding along West Rittenhouse Street, observed Appellant, wearing a white shirt and blue pants, exit a porta-potty in a park approximately fifty yards behind the laundromat. *Id.* at 6-7, 15. Few others were present in the area at that time of the morning. *Id.* at 7. Officer Jeter observed Appellant repeatedly looking over his shoulder at the marked police car and nearly running from the scene. *Id.* at 7-8. Appellant entered a coffee shop on the opposite side of the park. *Id.* at 6. Officer Jeter, suspecting that Appellant changed clothes in the porta-potty, approached Appellant in the coffee shop and advised him that he was being stopped under suspicion of having committed the robbery. *Id.* at 6, 8-9, 16-17. During the investigative detention, Appellant provided several false names. *Id.* at 9.

Within five minutes of her emergency phone call, police responded to the laundromat, drove McClay to the front of the coffee shop and asked her if

---

[2] The trial court conducted two separate hearings on the suppression motion.

she could identify Appellant as the robber. N.T. Suppression Hearing, 1/26/16, at 13-14. McClay remained in the police car during the attempted identification. N.T. Suppression Hearing, 1/29/16, at 20. She was unable to identify Appellant as the robber because she did not have her glasses on, because of the distance between her and Appellant, who was inside the coffee shop, and because Appellant no longer had on the red hoodie. N.T. Suppression Hearing, 1/26/16, at 13-14. McClay asked if she could observe Appellant from a nearer distance, but police declined for her safety. *Id.* at 14. McClay was familiar with Appellant, however, as he frequented the laundromat and his girlfriend had been employed there.[3] *Id.* at 9-10. Later that day, McClay identified Appellant from the laundromat's surveillance footage, which briefly depicted some of Appellant's face. *Id.* at 15, 30. Appellant provided his real name after police informed him of the negative identification, and police discovered an open warrant for him. N.T. Suppression Hearing, 1/29/16, at 10-11. In a search incident to arrest for the open warrant, police observed more than $200.00 in cash on Appellant's person, but they did not seize the money. *Id.* at 13; N.T. Suppression Hearing, 1/26/16, at 5.

---

[3] At trial, McClay testified that Appellant's then-girlfriend had been fired from the laundromat the day before the robbery. N.T. Trial, 6/27/17, at 14-16. Upon learning of her termination, the girlfriend threatened to have the laundromat robbed. *Id.* The girlfriend took the witness stand and confirmed making a statement to that effect. *Id.* at 88. We provide this information for context only, as it is outside of the scope of our review of the issue on appeal.

Prior to trial, Appellant filed a motion to suppress the observations of the cash on his person. The trial court denied the motion. A jury found Appellant guilty of the aforementioned offenses at the conclusion of a two-day trial in June of 2017. The trial court imposed sentence as set forth above and this timely appeal followed. Appellant asserts the trial court erred in denying his motion to suppress the cash recovered from his person.

Our standard of review is well-settled:

> [An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where ... the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [ ] plenary review.

*Commonwealth v. Smith*, 164 A.3d 1255, 1257 (Pa. Super. 2017). Our scope of review is limited to the record of the suppression hearing. *In re L.J.*, 79 A.3d 1073, 1085 (Pa. 2013).

Appellant argues that police lacked reasonable suspicion to stop him because he matched only the race and gender of the perpetrator's description. He argues that his unlawful detention should have ended upon McClay's

- 4 -

negative identification, and that the amount of money police observed on Appellant's person during the search incident to arrest should not have been admitted into trial.

> An officer who lacks the level of information required for probable cause to arrest need not simply shrug his shoulders and allow a crime to occur or a criminal to escape. Where an officer reasonably suspects that criminal activity is afoot, the officer may temporarily freeze the *status quo* by preventing the suspect from leaving the scene in order to ascertain his identity and gather additional information. [*Terry v. Ohio*, 392 U.S. 1, 21, (1968)]. The officer may also conduct a quick frisk for weapons if he reasonably fears that the person with whom he is dealing may be armed and dangerous. The question of whether reasonable suspicion existed at the time of an investigatory detention must be answered by examining the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the individual stopped of criminal activity. There is no ready test for determining reasonableness other than by balancing the need to search or seize against the invasion to which the search or seizure entails. Police are generally justified in stopping an individual when relying on information transmitted by a valid police bulletin.

*In re D.M.*, 727 A.2d 556, 557–58 (Pa. 1999) (some citations omitted).

The *D.M.* Court rejected an argument similar to the one Appellant offers here. There, police received a report of several black males involved in a robbery at a given location. *Id.* at 557. The defendant argued the description was too vague. But police arrived with in one or two minutes and observed the defendant and three other black males walking quickly away from the site of the robbery. *Id.* The defendant and his companions were the only people in the area. *Id.* They changed direction upon observing the police. *Id.* Our

Supreme Court concluded police had reasonable suspicion to stop the defendant:

> Here, appellant and his companions matched the number of suspects broadcast in the report; they matched the race of the suspects; they were the only individuals observed in the vicinity of the robbery; they were seen a mere one-half block away within approximately one minute of the crime; and they acted evasively when they saw the police vehicle.

*Id.* at 558.

Instantly, McClay informed police of the lone perpetrator's race, gender, clothing, and the time and place of the robbery. Appellant was by himself, he was the only one in the vicinity of the laundromat at the time of the robbery, Officer Jeter arrived within one minute, and Appellant acted evasively when he observed Officer Jeter's police cruiser. Appellant's clothing did not match the suspect's description, but Officer Jeter suspected the change in clothing took place in the porta-potty. Contrary to Appellant's argument, Officer Jeter acted on much more than a generalized description of the suspect's race and gender.

Appellant relies on *Commonwealth v. Hicks*, 253 A.2d 276 (Pa. 1969), in which the perpetrator was described as "a negro in his thirties with a mustache and wearing a brown coat." *Id.* at 278. The defendant met the description only insofar as "he was a negro in his thirties." *Id.* at 279-280. The complainants observed the defendant at 3:45 and police stopped him at 4:30. *Id.* at 278. When police detained him, "he was walking down the street like any other pedestrian. He was not carrying anything, nor acting in an

unusual manner." *Id.* at 278. His clothing did not match the suspect's description, nor did he have a mustache. *Id.* Appellant also relies on *Commonwealth v. Berrios*, 263 A.2d 342 (Pa. 1970), wherein police were informed that "two negroes in dark clothing, and one Puerto Rican in light clothing, believed to be involved [in a shooting], were observed leaving the scene and walking east on Ontario Street." *Id.* at 344. Police had no information about the physical make up of any of the three. *Id.* Twenty minutes later, police observed "a negro in dark clothing and a Puerto Rican in light clothing walking together in an easterly direction on Ontario Street about three blocks from the scene of the reported shooting. *Id.* Both men were walking along the street doing nothing out of the ordinary. *Id.* Our Supreme Court held that two men walking together fitting a very general description of the suspects was insufficient to support the stop. *Id.*

*Hicks* and *Berrios* are easily distinguishable. In *Hicks*, the defendant was walking down the street normally and police did not observe or detain him until well after the complainants observed and reported him. His clothing differed and he lacked a mustache. Instantly, in contrast, Appellant was looking over his shoulder at the police cruiser and running in the opposite direction. Police observed him only a minute after the incident. He was the only person in the area and his change of clothing could have occurred in the porta-potty behind the laundromat. Likewise, in *Berrios*, the defendant was not observed until twenty minutes after the shooting and he met a very

- 7 -

general description of one of the perpetrators. Despite the lapse of time, he was only three blocks away from the scene, and he exhibited no evasive or unusual behavior. Appellant's presence on the scene shortly after the robbery and his evasive conduct upon observing the police cruiser plainly distinguish this case from **Berrios**. We note that the **D.M.** Court examined **Hicks** and **Berrios** and distinguished them for similar reasons. **D.M.**, 727 A.2d at 560.

In summary, we conclude that police had reasonable suspicion to stop Appellant to ascertain his involvement in the robbery. We therefore need not consider the Commonwealth's argument that the trial court's decision was appropriate under **Utah v Strieff**, 136 S. Ct. 2056 (2016), in which the United States Supreme Court held that discovery of an outstanding warrant sufficiently attenuated the connection between an unlawful stop and the evidence seized pursuant to a lawful arrest.

Judgment of sentence affirmed.

President Judge Emeritus Ford Elliott joins this memorandum.

Judge Murray concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/19/19