RENDERED:  NOVEMBER 8, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0540-MR

COMMONWEALTH OF KENTUCKY                    APPELLANT

APPEAL FROM JESSAMINE CIRCUIT COURT
v.          HONORABLE HUNTER DAUGHERTY, JUDGE
ACTION NO. 22-CR-00364

SAMUEL GAMBREL                              APPELLEE

OPINION
AFFIRMING IN PART, REVERSING IN PART, AND REMANDING

** ** ** ** **

BEFORE:  CALDWELL, CETRULO, AND A. JONES, JUDGES.

JONES, A., JUDGE:  The Commonwealth submits an interlocutory appeal

authorized under KRS[1] 22A.020(4) from the Jessamine Circuit Court's order

granting Samuel Gambrel's motion to suppress evidence.  After our review of the

facts and the law, we affirm in part, reverse in part, and remand for further

proceedings.

---

[1] Kentucky Revised Statute.

# I. BACKGROUND

On October 14, 2022, at approximately 9:00 a.m., Officer Kyle Lamb of the Nicholasville Police Department was dispatched to a Walmart parking lot in Jessamine County to perform a welfare check. The dispatcher informed Officer Lamb that there were two individuals who appeared to be asleep or unconscious in a parked vehicle. Based on the license plate number of the vehicle, the dispatcher was able to tell Officer Lamb that the owner of the vehicle was Samuel Gambrel.

Officer Lamb arrived at the Walmart shortly before another police officer, Officer Howard. The two officers saw that, while the male driver appeared to be merely asleep, there was some concern about the condition of the female in the passenger seat because she was slumped forward, with her head hanging down. Officer Lamb approached the vehicle on the driver's side, while Officer Howard approached the passenger's side. At this point, the two officers discovered there was a third individual, a male asleep in the vehicle's back seat on the driver's side. Officer Howard tapped on the female passenger's window and woke the three occupants. The driver identified himself as Gambrel, the female passenger identified herself as Jennifer Gordon, and the male in the back seat identified himself as Nathaniel Atkins.

Officer Lamb would later describe the three individuals as cooperative, and they did not appear under the influence of drugs or alcohol. The

-2-

officer further stated that the three did not demonstrate any suspicious conduct, but he also candidly admitted that he did not consider them free to leave during this encounter. At this time, the police asked the three occupants of the vehicle for their identification. Atkins informed Officer Lamb that he did not have his driver's license on him, but he gave the officer his social security number. Officer Lamb then asked a third officer who had arrived at the scene, Officer Tune, to "stand by" the vehicle door next to Atkins while he ran the information in his cruiser.

Upon running the information, Officer Lamb discovered that Atkins had three open warrants. The officers informed Atkins of the warrants and asked him to step out of the vehicle because he was under arrest. When Atkins exited the vehicle, Officer Tune observed a clear plastic bag, in plain view, where Atkins had previously been sitting. The plastic bag contained a substance which appeared to be methamphetamine. After the officers saw the plastic bag, they asked Gambrel and Gordon to exit the vehicle while they conducted a search. The officers found a black lockbox on the front passenger floorboard, and the key to the lockbox was found on Gambrel's keyring. Inside the lockbox, the officers found several clear plastic bags, a paper bindle, and a pill bottle – all of which contained a substance appearing to be methamphetamine. A search of Atkins following his arrest revealed a small quantity of cocaine wrapped in a dollar bill on his person.

As a result of this incident, the Jessamine County grand jury indicted Gambrel on five charges: (1) first-degree trafficking in a controlled substance (more than two grams of methamphetamine);[2] (2) first-degree trafficking in a controlled substance (less than four grams of cocaine);[3] (3) possession of drug paraphernalia;[4] (4) possession of marijuana;[5] and (5) being a first-degree persistent felony offender.[6] Gambrel subsequently moved the trial court to suppress evidence, alleging the warrantless search of his vehicle violated his rights against unreasonable search and seizure guaranteed by Section 10 of the Kentucky Constitution and the Fourth Amendment of the United States Constitution. After a hearing conducted on February 24, 2023, the trial court granted Gambrel's suppression motion. The trial court focused on the fact that this was a welfare check of the occupants, and there was no reasonable articulable suspicion of criminal activity justifying the seizure of the vehicle occupants while they were asked for their identification. The trial court also found that the attenuation

---

[2] KRS 218A.1412(1)(b), a Class C felony.

[3] KRS 218A.1412(1)(e), a Class D felony.

[4] KRS 218A.500(2), a Class A misdemeanor.

[5] KRS 218A.1422, a Class B misdemeanor.

[6] KRS 532.080(3).

doctrine, an exception to the exclusionary rule, did not apply in this case due to the flagrancy of the officers' conduct. This appeal by the Commonwealth followed.

## II. ANALYSIS

"Citizens are protected from unreasonable government searches and seizures by the Fourth Amendment of the United States Constitution and Section 10 of the Kentucky Constitution." *Commonwealth v. Wilson*, 625 S.W.3d 252, 255 (Ky. App. 2021) (citation omitted). In construing the protection offered by Section 10 of the Kentucky Constitution, we are guided by the United States Supreme Court's interpretation of the federal Fourth Amendment. *Commonwealth v. Reed*, 647 S.W.3d 237, 243 (Ky. 2022).[7]

"Warrantless searches are '*per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.'" *Robbins v. Commonwealth*, 336 S.W.3d 60, 63 (Ky. 2011) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)). The exclusionary rule prevents the admission of evidence against the accused

---

[7] We note here that, prior to *Reed*, the Kentucky Supreme Court consistently ruled that "Section 10 of the Kentucky Constitution provides no greater protection than does the federal Fourth Amendment." *Cobb v. Commonwealth*, 509 S.W.3d 705, 712 (Ky. 2017) (quoting *LaFollette v. Commonwealth*, 915 S.W.2d 747, 748 (Ky. 1996)). However, in *Reed*, the majority opinion specifically used a less absolute term, "guidance," to describe how we should use United States Supreme Court opinions to interpret Section 10. 647 S.W.3d at 243. Furthermore, in a concurring opinion joined by Justice Hughes and Justice Keller, Chief Justice Minton opined, "[i]nsofar as *LaFollette* stands for the proposition that Section 10 and the Fourth Amendment are co-extensive in every application, we should overrule it." *Id*. at 258. In short, *Reed* may signal a change in how our Supreme Court approaches Section 10 in future opinions.

which was obtained in violation of the Fourth Amendment. *Warick v. Commonwealth*, 592 S.W.3d 276, 280 (Ky. 2019).

> The standard of review for a suppression motion has two parts:
>
> First, we review the trial court's findings of fact under a clearly erroneous standard. Under this standard, the trial court's findings of fact will be conclusive if they are supported by substantial evidence. We then conduct a *de novo* review of the trial court's application of the law to the facts to determine whether its decision is correct as a matter of law.

*Whitlow v. Commonwealth*, 575 S.W.3d 663, 668 (Ky. 2019) (quoting *Simpson v. Commonwealth*, 474 S.W.3d 544, 547 (Ky. 2015)). "Substantial evidence has been conclusively defined by Kentucky courts as that which, when taken alone or in light of all the evidence, has sufficient probative value to induce conviction in the mind of a reasonable person." *Bowling v. Nat. Resources and Environmental Protection Cabinet*, 891 S.W.2d 406, 409 (Ky. App. 1994).

The Commonwealth presents two issues on appeal. First, it argues that the trial court incorrectly ruled that Gambrel was "seized" within the meaning of the Fourth Amendment. In resolving whether Gambrel was seized, we must first examine the exact nature of his interaction with the police. "There are three types of interaction between police and citizens: consensual encounters, temporary detentions generally referred to as *Terry*[8] stops, and arrests." *Baltimore v.*

---

[8] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

*Commonwealth*, 119 S.W.3d 532, 537 (Ky. App. 2003). The type of interaction is important because the Kentucky Supreme Court has held that "an officer reasonably may ask for the identification and perform a criminal-records check of a driver and any passengers during an otherwise lawful traffic stop to determine an individual's prior contact with law enforcement." *Carlisle v. Commonwealth*, 601 S.W.3d 168, 179 (Ky. 2020). If *Carlisle* applies to the facts of this case, the police did not illegally seize the vehicle's occupants when they were asked for identification, and the trial court erred when it suppressed the evidence resulting from Atkins's arrest.

However, given the facts presented here, the police officers were not conducting an "otherwise lawful traffic stop" based on a reasonable articulable suspicion of criminal wrongdoing, *i.e.*, a *Terry* stop. *Id.* at 175. Officer Lamb admitted that there was no reasonable suspicion of criminal wrongdoing during the encounter. This was a welfare check of the vehicle's occupants. Once the officers determined the occupants were not intoxicated or otherwise in need of assistance, the mission of the welfare check was complete. Accordingly, the trial court correctly treated this welfare check as belonging in the first category of police interactions in *Baltimore*, a "consensual encounter."

Nevertheless, although there was no basis under *Carlisle* to detain the vehicle occupants in order to obtain their identification, the mere fact that police

officers approached the vehicle did not create a seizure. In its opinion and order, the trial court correctly noted that "a seizure does not occur simply because a police officer approaches an individual to ask a few questions." (Record (R.) at 31) (quoting *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 2386, 115 L. Ed. 2d 389 (1991)). Furthermore, Officer Lamb's requests for information did not necessarily transform the consensual encounter into a seizure. "[A] request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *Commonwealth v. Garrett*, 585 S.W.3d 780, 791-92 (Ky. App. 2019) (quoting *I.N.S. v. Delgado*, 466 U.S. 210, 216, 104 S. Ct. 1758, 1762, 80 L. Ed. 2d 247 (1984)). Similarly, the presence of more than one police officer at the scene does not necessarily create a seizure under the Fourth Amendment. "[A]pproaching the vehicle in this manner [with one officer on each side of the car], by itself, does not make the encounter nonconsensual." *Id.* at 791 (citations omitted). It is important to observe, however, that these precedents use "by itself" or similar language, implying that there are scenarios under which these factors, combined with others, *may* result in a seizure taking place.

The question of whether and when a consensual encounter with police becomes a seizure must be analyzed as the trial court did in this case, through the lens of *United States v. Mendenhall*, 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). Under *Mendenhall*, "a person has been 'seized' within the meaning of

-8-

the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id*. at 554, 100 S. Ct. at 1877. The trial court first noted that Officer Lamb could not recall whether Gambrel's license had been taken to run its information, or likewise whether any of the cruisers at the scene blocked Gambrel's vehicle. The trial court then focused on two facts to rule that there was a seizure: (1) Officer Lamb directed Officer Tune to "stand by" Atkins while he ran the information at his cruiser, and (2) Officer Lamb admitted he considered Gambrel and his passengers to be detained.

The Commonwealth contends that the two facts cited by the trial court were not enough to support its finding that Gambrel had been seized. First, the Commonwealth argues there was no testimony suggesting that the encounter was anything but cordial. In addition, the Commonwealth argues that the fact that Officer Tune was directed to stand by Atkins, rather than Gambrel, should indicate that Gambrel was differently situated than Atkins regarding whether he would feel free to leave. More significantly, the Commonwealth also points out that, per language in *Mendenhall* itself, the subjective intention of Officer Lamb regarding whether he considered the vehicle's occupants to be detained was "irrelevant except insofar as that may have been conveyed to the [defendant]." *Id*. at 554 n.6, 100 S. Ct. at 1877 n.6.

-9-

Although we agree with the Commonwealth that Officer Lamb's subjective intent would not normally be relevant, it is nonetheless important to focus on the second part of the quoted portion of *Mendenhall*, which is "except insofar as that may have been conveyed to the [defendant]." *Id*. Officer Lamb considered the vehicle to be detained and, accordingly, directed Officer Tune to stand next to Atkins on the driver's side of the vehicle, while he returned to his cruiser. The implication from this action is clear; an appointed guard would be unnecessary for someone who is free to leave. Meanwhile, Officer Howard was positioned on the opposite side of the vehicle, next to Jennifer Gordon in the passenger seat. Even if Officer Lamb did not explicitly tell the vehicle's occupants that they were being detained, Officer Lamb's direction to Officer Tune, combined with Officer Howard's position on the other side, may be reasonably construed as conveying that impression.

"[A] seizure does not occur 'as long as the person to whom questions are put remains free to disregard the questions and walk away[.]'" *Commonwealth v. Perry*, 630 S.W.3d 671, 675 (Ky. 2021) (quoting *Mendenhall*, 446 U.S. at 554, 100 S. Ct. at 1877). One of the examples in *Mendenhall* of a circumstance which could indicate a seizure is "the threatening presence of several officers," 446 U.S. at 554, 100 S. Ct. at 1877. Here, there were three officers bracketing Gambrel's vehicle, and because the officers arrived on the scene at different points in Officer

-10-

Lamb's narrative, there were at least two police cruisers, possibly three at the scene. This was an extraordinary police presence for nothing more than a welfare check on people sleeping in a parked car at a Walmart, people who were not the subject of any reasonable articulable suspicion of wrongdoing. In sum, based on the facts presented, the trial court did not consider it reasonable to believe that Gambrel would have been free to disregard the officers and drive away, which transformed the consensual encounter into a seizure. We cannot say the trial court's factual findings and conclusions were clearly erroneous on that point.

However, for its second issue on appeal, the Commonwealth argues that the trial court erroneously found the attenuation doctrine did not apply to allow the admission of evidence. Although the illegal seizure of Gambrel's vehicle would ordinarily result in the application of the exclusionary rule, three exceptions exist which "involve the causal relationship between the unconstitutional act and the discovery of evidence. . . . These exceptions are the independent source doctrine, the inevitable discovery doctrine, and the attenuation doctrine." *Warick*, 592 S.W.3d at 281 (internal quotation marks omitted) (quoting *Utah v. Strieff*, 579 U.S. 232, 238, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 (2016)). In *Strieff*, the United States Supreme Court defined the attenuation doctrine as allowing the admission of evidence "when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening

-11-

circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'"[9] *Strieff*, 579 U.S. at 238, 136 S. Ct. at 2061 (quoting *Hudson v. Michigan*, 547 U.S. 586, 593, 126 S. Ct. 2159, 2164, 165 L. Ed. 2d 56 (2006)). "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence, which often has nothing to do with a defendant's actions." *Id.*

To determine whether the causal link has been broken between the unlawful stop and law enforcement's discovery of evidence, *Strieff* requires a court to consider three factors: (1) "the 'temporal proximity' between the unconstitutional conduct and the discovery of evidence[;]" (2) "the presence of intervening circumstances[;]" and (3) "the purpose and flagrancy of the official misconduct." *Id.* at 239, 136 S. Ct. at 2062 (quoting *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 2261-62, 45 L. Ed. 2d 416 (1975)). Of these factors, the Supreme Court considered the purpose and flagrancy of the misconduct to be "particularly significant." *Id.*

---

[9] The Fourth Amendment does not prescribe a remedy for its violation. To enforce the Constitution's probable-cause requirement, the United States Supreme Court long ago recognized the exclusionary rule. But it must be remembered that "exclusion is not an individual right, but rather a judicially crafted means of preventing future Fourth Amendment violations." *United States v. Elmore*, 18 F.4th 193, 199 (6th Cir. 2021). The attenuation doctrine seeks to reserve exclusion for those cases where suppression will most likely lead to some "appreciable deterrence of law enforcement misconduct." *United States v. Neal*, 106 F.4th 568, 571 (6th Cir. 2024) (internal quotation marks and citation omitted).

The first factor, temporal proximity, examines "how closely the discovery of evidence followed the unconstitutional [conduct]." *Garrett*, 585 S.W.3d at 795 (quoting *Strieff*, 579 U.S. at 239, 136 at S. Ct. 2061-62). *Strieff* explained that "[o]ur precedents have declined to find that this factor favors attenuation unless substantial time elapses between an unlawful act and when the evidence is obtained." *Strieff*, 579 U.S. at 239, 136 S. Ct. at 2062 (internal quotation marks and citation omitted). By way of example, *Strieff* pointed to *Brown*, the case which originated this test, to show that a timeframe of less than two hours would counsel in favor of suppression. *Id.* As was true in both *Strieff* and *Garrett*, the facts of this case show only a short time interval between the unconstitutional conduct and the discovery of evidence, which argues in favor of suppression.

The second factor in *Strieff* is "the presence of intervening circumstances." *Id.* at 240, 136 S. Ct. at 2062. *Strieff* tells us that this second factor "strongly favors the State[,]" and "the existence of a valid warrant" counsels against suppression of the evidence. *Id.* Both *Strieff* and *Garrett* considered the existence of a warrant to be a sufficient intervening circumstance, although the cases were factually distinct. The police officers in *Garrett* handcuffed the defendant for twenty minutes while they investigated the possibility of a warrant, and it turned out that such a warrant did not exist. *Garrett*, 585 S.W.3d at 795. In

*Strieff*, however, "the warrant was valid, it predated [the officer's] investigation, and it was entirely unconnected with the stop. And once [the officer] discovered the warrant, he had an obligation to arrest Strieff." *Strieff*, 579 U.S. at 240, 136 S. Ct. at 2062. Notably, the *Garrett* Court held that the second factor in its case weighed in favor of suppression because the seizure was grounded in the possibility of a warrant which never actually existed. *Garrett*, 585 S.W.3d at 795-96.

The third factor in *Strieff* involves "the purpose and flagrancy of the official misconduct[.]" *Strieff*, 579 U.S. at 241, 136 S. Ct. at 2063 (quoting *Brown*, 422 U.S. at 604, 95 S. Ct. at 2262). *Strieff* informs us that this factor "also strongly favors the State[,]" reflecting the rationale that exclusion is appropriate "only when . . . police misconduct is most in need of deterrence[.]" *Id.* *Garrett*, in its analysis of this factor, laments that the United States Supreme Court in *Strieff* provided "little guidance to distinguish flagrant police conduct from non-flagrant police conduct." *Garrett*, 585 S.W.3d at 796. At best, *Strieff* tells us that "to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." *Id.* (quoting *Strieff*, 579 U.S. at 243, 136 S. Ct. at 2064). In *Strieff*'s analysis of the third factor, the Court reasoned that the officer involved "was at most negligent[,]" reasoning that "while [the officer's] decision to initiate

the stop was mistaken, his conduct thereafter was lawful." *Strieff*, 579 U.S. at 241, 136 S. Ct. at 2063.

In an analysis of the third factor, the facts of *Garrett*, by its own reckoning, were "in stark contrast with those in *Strieff*." *Garrett*, 585 S.W.3d at 797. The *Garrett* Court pointed out that the officers in that case "unlawfully detained Garrett for twenty minutes while dispatch dealt with its administrative snafu." *Id*. at 798. Garrett was handcuffed during the detention, which the Court deemed "excessively intrusive." *Id.* Moreover, *Garrett* pointed to inconsistencies in the officers' stated justifications for their actions, determining that "[t]he subsequent search of the vehicle, ostensibly for a weapon, without first conducting a 'pat down' . . . smacks of pretext." *Id.* In short, the totality of the circumstances demonstrated that *Garrett*, unlike *Strieff*, showed flagrant police misconduct. *Id*. at 799.

Returning to the present case, the trial court's opinion and order focused on the facts before it and examined them in light of *Strieff*, *Garrett*, and an unpublished case from this Court, *Commonwealth v. Skaggs*.[10] The trial court focused on the third *Strieff* factor and determined that the police officer conduct was flagrant. The trial court stated that, while the officers in this case did not show "bad faith or ill motive," the officers in *Garrett* did not demonstrate bad faith

---

[10] No. 2020-CA-0441-MR, 2021 WL 68832 (Ky. App. Jan. 8, 2021).

either.  (R. at 36.)  The trial court reasoned that the officers in this case were simply on a welfare check and, "once they had determined that the occupants were well, there was simply no reason to continue the investigation."  (R. at 36.)  The trial court pointed out that, unlike *Strieff*, there was no need for a records check to protect officer safety.  In addition, there were no suspicious circumstances or conduct, the vehicle occupants were cooperative, and the investigation was not in a suspicious time or place, but during daylight hours in a Walmart parking lot.  Ultimately, the trial court ruled that Gambrel and the other vehicle occupants "had the same expectations of privacy as pedestrians on Main Street[.]"  (R. at 36.)

We understand the trial court's reluctance to apply the attenuation doctrine to allow evidence in this case.  However, the facts in this case regarding flagrancy are closer to those of *Strieff* than *Garrett*.  The trial court relies on facts illustrating the relatively innocuous circumstances of this encounter.  Yet we are persuaded by two points which lean toward application of the attenuation doctrine.  First, there is the United States Supreme Court's language in *Strieff*, which tells us that a negligent mistake, made in good faith and followed by lawful conduct, cannot result in a finding of flagrant misconduct.  *Strieff*, 579 U.S. at 241, 136 S. Ct. at 2063.  Second, there is the Kentucky Supreme Court's decision in *Carlisle*, which holds "an officer reasonably may ask for the identification and perform a criminal-records check of a driver and any passengers during an otherwise lawful

traffic stop to determine an individual's prior contact with law enforcement." 601 S.W.3d at 179. From the facts of this case, it appears that the officers mistakenly applied *Carlisle* to a consensual encounter rather than "an otherwise lawful traffic stop." Returning to *Garrett*'s succinct quotation from *Strieff*, "to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." *Garrett*, 585 S.W.3d at 796 (quoting *Strieff*, 579 U.S. at 243, 136 S. Ct. at 2064).

Although the trial court believed the facts of this case were more similar to *Garrett* than *Strieff*, we cannot agree. Unlike *Garrett*, Atkins had actual warrants out for his arrest. Unlike *Garrett*, the occupants of the vehicle were not handcuffed for twenty minutes while police officers attempted to determine an occupant's warrant status. Finally, in *Garrett*, the police conduct appeared to be a "suspicionless fishing expedition in the hope that something would turn up[,]" which was unlike what occurred in *Strieff*. *Garrett*, 585 S.W.3d at 799 (quoting *Strieff*, 579 U.S. at 242, 136 S. Ct. at 2064). Here, the search of Gambrel's vehicle occurred because police officers spotted, in plain view, a plastic bag containing methamphetamine when Atkins was arrested and asked to step out of the vehicle. Aside from the officers lacking proper cause for seizure of the vehicle and its occupants, nothing which followed afterward amounted to misconduct.

This is an exceedingly close call, and neither the United States Supreme Court nor our own highest court has sufficiently articulated how to apply the third attenuation factor in cases such as this. Based on existing precedent, we conclude that the facts in this case favor an application of the attenuation doctrine. Even though the wrongful detention and discovery of the evidence in question occurred close in time, it appears that, at most, the police were negligent in their assessment of the facts, mistakenly believing they could briefly detain the vehicle's occupants while running Atkins's social security number through the system. Thereafter, the active warrant was an intervening factor permitting a search of the vehicle prior to placing Gambrel under arrest. Under these facts, we hold the trial court erroneously failed to apply the attenuation doctrine pursuant to the United States Supreme Court's decision in *Strieff*.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment insofar as it determined that the police conducted an illegal seizure of Gambrel's vehicle and its occupants. However, following the United States Supreme Court's decision in *Strieff*, we reverse the trial court's finding that the attenuation doctrine did not apply to allow admission of the evidence in this case. We remand for further proceedings not inconsistent with this Opinion.

ALL CONCUR.

BRIEFS FOR APPELLANT:                    BRIEF FOR APPELLEE:

Daniel Cameron                           Emily Holt Rhorer
Attorney General of Kentucky             Frankfort, Kentucky

Jenny L. Sanders
Assistant Attorney General
Frankfort, Kentucky