

# NUMBER 13-24-00073-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

MARVIN LOUIS GUY,          **Appellant,**

**v.**

THE STATE OF TEXAS,          **Appellee.**

## ON APPEAL FROM THE 27TH DISTRICT COURT
## OF BELL COUNTY, TEXAS

## MEMORANDUM OPINION

### Before Chief Justice Tijerina and Justices Peña and West
### Memorandum Opinion by Justice West

Appellant Marvin Louis Guy was indicted for the capital murder of Killeen Police Department Officer Charles Dinwiddie on November 14, 2018. Appellant's trial began on November 6, 2023, and occurred over eleven days. At trial, it was undisputed that appellant shot and killed Officer Dinwiddie, and appellant asserted claims of self-defense and defense of property. The jury rejected appellant's defensive claims and convicted

appellant of the lesser-included offense of murder, a first-degree felony. *See* TEX. PENAL CODE § 19.02(b)(1), (c). The jury assessed his punishment at life in prison, and the trial court sentenced him in accordance with the jury's verdict. By seven issues which we reconstrue as six, appellant argues that: (1) the evidence is legally insufficient to support the jury's verdict because the jury could not rationally reject his defensive claims, and the trial court abused its discretion when it (2)–(3) denied his motion to suppress, (4) denied his motion to suppress evidence recovered as a result of a signed consent waiver to search his residence, (5) overruled his motion for mistrial, and (6) allowed a video excerpt of appellant's interrogation into the punishment phase of trial. We affirm.

## I.     BACKGROUND[1]

At trial, Killeen Police Department detective John Moseley testified that sometime in early 2014, the Department suspected that appellant was trafficking cocaine. Moseley explained that he received reports from a confidential informant that a "man he knew as 'G'" was trafficking cocaine out of a blue Crown Victoria outside a quadruplex on "1100 Circle M." Moseley, through his own observations of the area, identified a blue Crown Victoria which was owned by appellant on the same block as reported by the confidential informant. Moseley and his unit began to surveil appellant and observed "high traffic" to and from appellant's residence and vehicle. Moseley obtained a search warrant for appellant's residence and vehicle and communicated with Officer Dinwiddie to obtain a SWAT team for the search.

---

[1] This case is before this Court on transfer from the Third Court of Appeals in Austin pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE § 73.001.

In the early morning hours of May 9, 2014, multiple SWAT teams converged at the quadruplex on 1100 Circle M to execute the search warrant on appellant's unit and vehicle. One team consisting of seven to nine men was assigned to breach the front door of appellant's unit; a two-man team was stationed by the unit's front window—which opened into appellant's bedroom and where the shooting later occurred; and another team was stationed near the back door as a "secondary" entry point. A separate six-man team was assigned to appellant's vehicle parked in front of the quadruplex.

At approximately 5:30 a.m., the front door team initiated the raid by ramming a battering ram against the front door. The door failed to open because, as later revealed, a La-Z-Boy chair was blocking the front door. At about the same time, Xaiver Clark, an officer stationed by the front window, began knocking out the window. Clark testified that he yelled "Killeen Police Department" or "police department, search warrant" just prior to striking the window. Clark testified that he struck the window twice, and he "heard a pop" after the second strike. By the time he cleared the glass from the window, he could "see [a] muzzle flashing" and "a volley fire right behind that." He testified that the "muzzle flashes" were about three feet away from him, and he saw "a large figure that looked like it came from the sitting position to a standing position . . . towards the corner" of the room. Officers began shooting at the window and the front door of the unit. Later evidence revealed that appellant fired nine rounds from a nine-millimeter handgun, and expert testimony established that the fatal shot to Dinwiddie was fired from that handgun.

Much testimony was dedicated to describing the lighting conditions and the visibility of the officers. Testimony and video evidence revealed that it was dark outside when the raid was initiated. Right after the shooting began, a "flash bang" inadvertently

3

went off which caused the air outside the quadruplex to become cloudy. Multiple officers identified a bright outdoor light on the second floor of the quadruplex which helped illuminate the area. Multiple officers testified about the SWAT uniforms they wore during the raid and photos of the uniforms were introduced into evidence. Shirley Whittington, appellant's girlfriend at the time of the shooting, testified at trial that appellant "can't see" without glasses, and some evidence indicated that appellant was not wearing his glasses at the time of the raid.

Much testimony was also dedicated to whether the police announced themselves. Ten officers testified that officers called out "police, search warrant" or otherwise announced themselves as police, and at least eight of those officers testified that the officers announced their identity before the shooting began. Joanna Humfleet, who lived in the duplex unit above appellant's, testified that she did not hear the police announce their presence. Humfleet's eighteen-year-old daughter, who lived with her at the time, testified that she heard the word "warrant" before the shooting began.

Appellant eventually came out of the back door of the residence and surrendered to police. Officer Steve Kirk testified that when appellant exited the residence, "he made [a] statement [that] it was the woman that was shooting." Whittington was sleeping in the back bedroom at the time of the raid and exited the residence shortly after appellant.

Detectives Sharon Brank and Fred Harris interviewed appellant three times at the police station, and the interviews were recorded and played in part for the jury. Brank testified that appellant "was very eager to tell his side of the story" and told them that Whittington had nothing to do with the shooting. Appellant told the detectives that he was asleep when the raid began, and the first thing he heard upon waking up was glass

4

breaking in his bedroom. He said he never heard the police announce themselves or shout "search warrant," and "when he shot, it was just instincts." He repeatedly told Brank that he would not have fired if he had known he was shooting at officers. Appellant also told Brank that in the days preceding the shooting, he was paranoid that two men were watching him. He believed it was those men trying to get inside his residence when he began shooting.

The jury convicted appellant for the offense of intentional murder. During the punishment phase, the State presented evidence that appellant was previously convicted for bank robbery, felon in possession of a firearm, possession of a firearm after conviction of a misdemeanor crime of violence, and unlawful possession of a controlled substance with intent to deliver. The jury found the allegations true and assessed punishment as outlined above. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

By his first issue, appellant argues that the evidence is insufficient to support the jury's verdict because the jury could not rationally reject his claims of self-defense and defense of property.

### A. Standard of Review & Applicable Law

In reviewing the sufficiency of the evidence to support a conviction, we consider the evidence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The jury is the exclusive judge of the credibility of the witnesses and the weight to be

5

given to the evidence. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We defer to the jury's responsibility to fairly resolve conflicts in testimony, weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* This standard applies to both circumstantial and direct evidence. *Id.*

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009). A hypothetically correct jury charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Villarreal*, 286 S.W.3d at 327.

As charged here, a person commits the offense of murder if the person "intentionally or knowingly causes the death of an individual." TEX. PENAL CODE § 19.02(b)(1). A person is justified in using deadly force against another if they (1) would be justified in using force against the other under § 9.31, and (2) when and to the degree they reasonably believe the deadly force is immediately necessary to protect them against the other's use or attempted use of unlawful deadly force or to prevent the other's imminent commission of one of various enumerated felonies. *Id.* § 9.32(a). A person is justified in using deadly force to protect property if they (1) would be justified in using force against the other under § 9.41, (2) when and to the degree they reasonably believe the deadly force is immediately necessary to prevent the other's imminent commission of robbery, aggravated robbery, theft during the nighttime, or criminal mischief during the nighttime, and (3) he reasonably believes that:

6

(A)      the land or property cannot be protected or recovered by any other means; or

(B)      the use of force other than deadly force to protect or recover the land or property would expose the actor or another to a substantial risk of death or serious bodily injury.

*Id.* § 9.42. A "reasonable belief" is defined as one that would be held by "an ordinary and prudent [person] in the same circumstances as the actor." *Id.* § 1.07(a)(42). "Deadly force" is defined as "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3).

## B.     Analysis

Appellant argues that because the jury acquitted him of capital murder and convicted him of intentional murder, they necessarily rejected the notion "that he knew the persons he shot at were police officers in the performance of their duty." *See id.* § 9.03(a)(1) (requiring as an element of capital murder of a peace officer that the defendant murders a peace officer who is acting in the lawful discharge of an official duty and who the defendant knows is a peace officer). He contends that, therefore, the jury could not have rationally found against his claims of self-defense and defense of property because they necessarily found that he shot at "trespassers" or "people unknown to him."

Appellant argues these two positions are fatally inconsistent, but "the law does not bar inconsistent verdicts." *Guthrie-Nail v. State*, 506 S.W.3d 1, 6 (Tex. Crim. App. 2015) (first citing *United States v. Powell*, 469 U.S. 57, 68–69 (1984); and then citing *Dunn v. United States*, 284 U.S. 390, 393 (1932)); *see Hernandez v. State*, 556 S.W.3d 308, 321 (Tex. Crim. App. 2017) (op. on reh'g) (Richardson, J., concurring) ("Where a multi-count verdict appears inconsistent, our inquiry is limited to a determination of whether the evidence is legally sufficient to support the count on which a conviction is returned.").

7

"Inconsistent verdicts do not necessarily imply that the jury convicted the defendant on insufficient evidence, but may simply stem from the jury's desire to be lenient or to execute its own brand of executive clemency." *Miller v. State*, 712 S.W.3d 235, 254 (Tex. App.—Eastland 2025, pet. filed) (citing *Thomas v. State*, 352 S.W.3d 95, 101 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd)). "An inconsistent verdict which might have been the result of compromise or mistake 'should not be upset by appellate speculation or inquiry into such matters.'" *Meals v. State*, 601 S.W.3d 390, 396 (Tex. App.—Amarillo 2020, pet. ref'd) (quoting *Powell*, 469 U.S. at 64–67); *see Jones v. State*, 712 S.W.3d 151, 160–61 (Tex. App.—Corpus Christi–Edinburg 2024, no pet.).

Further, even if the jury did not believe that appellant knew he was firing at law enforcement officers, the jury could still reasonably reject his defensive claims and find him guilty of murder. A rational jury could have concluded that appellant did not have a reasonable belief that deadly force was immediately necessary to protect himself or his property. *See* TEX. PENAL CODE §§ 9.31, 9.41. For instance, evidence indicated that appellant shot first and fired nine rounds at officers. *See Harris v. State*, 668 S.W.3d 83, 91 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd) (concluding that jury could have rejected appellant's self-defense claim in part because jury could have believed the evidence that appellant drew his gun and fired first); *see also Lee v. State*, No. 04-24-00188-CR, 2025 WL 2808343, at *6 (Tex. App.—San Antonio Sept. 30, 2025, pet. ref'd) (mem. op., not designated for publication) (concluding that the jury had sufficient evidence to reject appellant's claim of self-defense in part because there was evidence that appellant fired multiple rounds at the victim before the victim could fire). The jury could have also found evidence of consciousness of guilt when appellant told officers when he

8

exited the residence that Whittington was the shooter. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (holding that making false statements to cover up a crime is circumstantial evidence indicating consciousness of guilt). Accordingly, we overrule appellant's first issue.

### III.  MOTIONS TO SUPPRESS

By his second and third issues, appellant argues that the trial court abused its discretion when it denied his motion to suppress the underlying no-knock search warrant for the raid on May 9, 2014. He argues that the underlying affidavit failed to supply probable cause and justification for the no-knock entry. However, in his appellate brief, he states:

> The harm to [appellant] in failing to suppress the evidence recovered in the search and arrest warrant . . . is almost immeasurable. All of the evidence against [appellant] flows from execution of the warrant—from his statements following his arrest to the physical evidence subsequently accumulated after the botched raid, including forensic evidence that linked him to the gun that fired the fatal bullet into Officer Dinwiddie. It is hard to imagine that more fruit could come from a "poisonous tree."

Essentially, appellant argues that because the underlying search warrant—issued on suspicion for drug related offenses—was illegal, then all the evidence gathered for appellant's subsequent murder charge should be suppressed.

We disagree. Appellant was not charged with any drug related offenses under the Texas Health & Safety Code. Instead, appellant was charged and convicted of murder for acts that occurred as officers executed the search warrant. Thus, regardless of whether the initial search warrant was illegal, the fruit of the poisonous tree doctrine would not apply to the evidence acquired from the subsequent investigation into appellant's murder

9

charge.[2] *See, e.g., State v. Iduarte*, 268 S.W.3d 544, 551 (Tex. Crim. App. 2008) ("If [the defendant] did point the gun at [a police officer], that act constituted an independent criminal offense committed after the complained-of entry, and the acquisition of evidence of the independent offense was not causally connected to the officer's allegedly illegal entry."); *Bell v. State*, 233 S.W.3d 583, 588 (Tex. App.—Waco 2007, pet. ref'd, untimely filed) (holding that appellant could not suppress all evidence recovered from his arrest for aggravated assault of a public servant even if the police initially acted illegally because commission of the assault constituted a new crime); *Tucker v. State*, 114 S.W.3d 718, 723–24 (Tex. App.—Corpus Christi–Edinburg 2003, pet. ref'd) (same); *see also Siaz v. State*, No. 03–10–00135–CR, 2011 WL 4424971, at *1–2 (Tex. App.—Austin Sept. 21, 2011, no pet.) (mem. op., not designated for publication) (concluding that even if an officer lacked probable cause to arrest the defendant for public intoxication, suppression of evidence that the defendant spat on the police officer could not be suppressed because the spitting comprised an independent offense). Accordingly, we overrule appellant's second and third issues.

### IV.    CONSENT TO SEARCH HOME

By his fourth issue, appellant argues that the trial court abused its discretion when it denied his motion to suppress a written waiver of consent for officers to search his home because his consent "was involuntary and the result of fear, intimidation and coercion not unattenuated from the circumstances of his arrest."

---

[2] Notably, appellant does not challenge the validity of a separate search warrant issued the day after appellant's arrest, which recovered evidence from the shooting such as shell casings, "projectiles," magazines, a black pistol, paper targets, and blood swabs.

## A.     Background

During appellant's second interview with detectives, appellant signed a written waiver of consent to search his home. Appellant later filed a motion to suppress, alleging, as he does on appeal, that "the consent was the result of police misconduct, overreach and coercion," and "the consent was tainted by the circumstances of his arrest and interaction with officer [Juan] Obregon."

At the pre-trial hearing on the motion, officers testified that appellant was generally compliant when he exited the residence and followed instructions to lie down. Obregon testified that while appellant was on the ground, he placed his knee on appellant's back, yelled continuously at appellant that if he moved, he "was going to [expletive] kill him," and placed his pistol into appellant's mouth. Obregon explained that he was angry and emotional because Officer Dinwiddie had been shot. Obregon testified that he withdrew the pistol when he noticed that appellant was gagging, and he got off appellant when other officers told him to calm down. Obregon testified that he reported his conduct to his commander, and he was later reprimanded for his actions.

Brank testified at the hearing that she issued *Miranda* warnings at the beginning of appellant's first interview, which occurred around 7:35 or 7:45 a.m. and went until around 9:00 a.m. "or a little after." Appellant initialed a written *Miranda* waiver, and the document was entered into evidence. Brank interviewed appellant again "close to one o'clock p.m." and that interview lasted between five to ten minutes. Brank said that she did not re-read appellant his *Miranda* rights but reminded him that his *Miranda* rights "were still in effect and if he understood those," and he responded affirmatively. She then asked

11

appellant for consent to search his home. She said appellant did not hesitate and signed the written waiver, which was also admitted into evidence.

Appellant's trial counsel contended that appellant's consent to search his home was tainted by the circumstances of his interaction with officer Obregon and subject to suppression. The trial court overruled counsel's objection and denied the motion to suppress.

## B.  Standard of Review & Applicable Law

"We review a trial court's denial of a motion to suppress for an abuse of discretion and apply a bifurcated standard of review, affording almost complete deference to the trial court's determination of historical facts, especially when those determinations are based on assessments of credibility and demeanor." *Wells v. State*, 611 S.W.3d 396, 405 (Tex. Crim. App. 2020) (citing *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016)). "We review *de novo* mixed questions of law and fact that do not hinge on assessments of credibility or demeanor." *Id.* at 405–06 (citing *Brodnex v. State*, 485 S.W.3d 432, 436 (Tex. Crim. App. 2016)). "If the ruling of the trial court is correct under any applicable theory of law, we will sustain its ruling." *Id.* at 406 (citing *Furr*, 499 S.W.3d at 877). When, as in this case, the trial court did not make explicit findings of fact, we review the evidence in the light most favorable to the trial court's ruling. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007).

"The federal exclusionary rule requires the suppression of evidence obtained either directly or derivatively ('fruit of the poisonous tree') from police conduct that violates the Fourth Amendment." *Massey v. State*, 667 S.W.3d 784, 788 (Tex. Crim. App. 2023) (citing *Utah v. Strieff*, 579 U.S. 232, 237 (2016)). "But whether the discovery of evidence was

12

the fruit of Fourth Amendment misconduct is not a strictly but/for inquiry." *Id.* (citation modified). "Suppression of evidence is a last resort, not a first impulse." *Id.* (citation modified). "Accordingly, the United States Supreme Court has identified exceptions to the exclusionary rule, one of which is the attenuation-of-taint doctrine." *Id.* (citing *Strieff*, 579 U.S. at 238). Under this doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the discovery of evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Id.* (quoting *Strieff*, 579 U.S. at 238). In other words, under the attenuation-of-taint doctrine, "evidence may be admitted at trial if the connection between the initial illegality and the means through which the evidence was secured is so attenuated as to dissipate the taint." *Weems v. State*, 167 S.W.3d 350, 359 (Tex. App.— Houston [14th Dist.] 2005, pet. ref'd); *Hudson v. State*, 247 S.W.3d 780, 787 (Tex. App.— Amarillo 2008, no pet.).

To determine whether this connection is sufficiently remote or attenuated, we consider: (1) whether *Miranda* warnings were given, (2) the temporal proximity between the misconduct and discovery of the evidence, (3) the presence of any intervening circumstances, and (4) the purpose and flagrancy of the police misconduct. *See Brown v. Illinois*, 422 U.S. 590, 603–04 (1975); *Massey*, 667 S.W.3d at 789 (citing *Brown*, 422 U.S. at 603–04); *Martinez v. State*, 620 S.W.3d 734, 741 (Tex. Crim. App. 2021) (citing *Brown*, 422 U.S. at 603–04). "No single factor is decisive." *Monge v. State*, 315 S.W.3d 35, 40 (Tex. Crim. App. 2010). "[E]ither the first factor ('temporal proximity') or the third factor ('purpose and flagrancy') will take on greater significance in any given case,

13

depending upon whether the second factor (any 'intervening circumstances') is present." *Id.* (citing *State v. Jackson*, 464 S.W.3d 724, 732 (Tex. Crim. App. 2015)). "So, when there *is* an intervening circumstance as contemplated by *Brown*, the *Brown* inquiry emphasizes the third factor—the purpose and flagrancy of the police misconduct." *Id.* (citing *Jackson*, 464 S.W.3d at 733).

## C.    Analysis

For the sake of appellant's argument, we will assume that Obregon's misconduct was an illegal use of force and that incriminating evidence was recovered as a result of appellant's consent waiver.[3]

Here, the parties do not dispute that *Miranda* warnings were given to appellant, and appellant does not challenge the adequacy of the warnings. This factor weighs in favor attenuation.

As to the second factor, the Court of Criminal Appeals has held that if the time between the illegal conduct and discovery of the evidence is under three hours, this factor weighs in favor of the defendant. *Monge*, 315 S.W.3d at 41 ("[I]f there is a short period of time (under three hours) between the illegal arrest and the confession, this factor will weigh in favor of appellant."); *see also Garcia v. State*, No. 13-19-00626-CR, 2022 WL 1492838, at *9 (Tex. App.—Corpus Christi–Edinburg May 12, 2022, no pet.) (mem. op., not designated for publication) (citing *Monge*, 315 S.W.3d at 41). Obregon's misconduct

---

[3] The record is unclear as to exactly what evidence, if any, was recovered after appellant signed the consent waiver. Appellant contends, without citing to the record, that the evidence recovered included "a gun used in that shooting which was forensically linked to [appellant] and to the bullet recovered at officer Dinwiddie's autopsy," and "paper targets the State sought to use as proof that [appellant] intended an ambush of officers as they entered his home." The State contends that appellant is incorrect, and the complained-of evidence was collected as a result of the search warrant issued the day after appellant's arrest. Out of an abundance of caution, we will analyze whether appellant's consent to search his residence was given involuntarily as a result of Obregon's misconduct.

occurred when appellant was arrested, which must have occurred at some point before his first interview with detectives around 7:35 or 7:45 am. Appellant gave consent to search his residence during the second interview with detectives, which occurred close to 1:00 p.m. Thus, well over three hours passed between Obregon's misconduct and appellant's consent. This factor weighs in favor of attenuation. *See Monge*, 315 S.W.3d at 41.

Appellant concedes that the third factor weighs in the State's favor because appellant initiated communication with the detectives, and this is "an intervening circumstance borne of his own free will." *Martinez*, 620 S.W.3d at 741–42 ("A suspect's request to speak to the police may be an intervening circumstance if the request is a product of the suspect's own free will.").

Appellant contends, however, Obregon's behavior was so "flagrantly abusive," "shocking and reprehensible" that it outweighs the factors above. Appellant relies on *Martinez* for support. *See id.* However, *Martinez* is clearly distinguishable from the facts of this case. In that case, a nineteen-year-old was illegally arrested and the Court of Criminal Appeals found that the circumstances of the arrest, including transporting him from his mother's house at midnight, "seemed designed to cause fear, surprise, and confusion for the purpose of getting a confession." *Id.* at 743 ("Appellant invoked his right to counsel, [officers] announced that he was under arrest for murder, handcuffed him, confined him to a holding cell, and chained him to a bench. There was no evidence that [a]ppellant was a flight risk, that there was no time to get an arrest warrant, or that some other urgency justified the warrantless arrest."). Here, even assuming Obregon used illegal force, there is no dispute that appellant's arrest was supported by probable cause,

15

and appellant does not contend that Obregon's actions were purposeful or calculated. *See id.* at 744 ("The arrest had a quality of purposefulness; it was for investigation, embarked upon in the hopes that something might turn up, and the arrest seems to have been calculated to cause surprise, fright, and confusion."). Moreover, unlike this case, the Court found that the temporal proximity between the police misconduct and confession, the presence of any intervening circumstances, and the purpose and flagrancy of the police misconduct all weighed in the appellant's favor. *Id.* The Court did not find that the last factor outweighed the other factors. *See id.* We overrule appellant's fourth issue.

## V.     MOTION FOR MISTRIAL

By his fifth issue, appellant argues that the trial court abused its discretion when it overruled his motion for mistrial when a State's witness asserted that appellant had a "violent past."

## A.     Background

At trial, Detective Jason Petty, one of the SWAT members who participated in the raid, testified about the mission. At the beginning of his testimony, Petty testified that the mission involved a "high-risk warrant." The State asked Petty whether there was "anything different about this high-risk warrant than all the other[] [missions]" Petty participated in. Petty responded that it involved "a target of investigation who had a violent past." Defense counsel immediately objected. The trial court excused the jury.

Defense counsel argued that Petty's statement violated the defense's motion in limine and moved for a mistrial. The State responded that Petty's statement was "inadvertent" and contended that "an instruction to disregard" was appropriate to cure the

16

error. The trial court denied the motion for mistrial. Defense counsel then requested an instruction to disregard, which the trial court granted. When the jury returned, the trial court instructed the jury to "totally disregard all of" Petty's testimony. The State then restarted Petty's direct examination.

**B.      Standard of Review & Applicable Law**

We review a trial court's denial of a motion for mistrial under an abuse of discretion standard. *Archie v. State*, 340 S.W.3d 734, 738–39 (Tex. Crim. App. 2011). We must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Id.* at 699; *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). In determining whether the trial court abused its discretion in denying a mistrial, we may consider (1) the severity of the misconduct (i.e., the prejudicial effect), (2) the curative measures adopted by the trial court, and (3) the certainty of conviction absent the misconduct. *Archie*, 340 S.W.3d at 739.

"A mistrial is an appropriate remedy in extreme circumstances for a narrow class of highly prejudicial and incurable errors." *Ocon*, 284 S.W.3d at 884 (citation modified). "Because it is an extreme remedy, a mistrial should be granted only when residual prejudice remains after less drastic alternatives are explored." *Id.* at 884–85 (citation modified). Even if inadmissible testimony or other evidence comes before the jury, "our law prefers that the trial continue" unless the evidence "is so emotionally inflammatory that curative instructions are not likely to prevent the jury being unfairly prejudiced against the defendant." *Bauder v. State*, 921 S.W.2d 696, 698 (Tex. Crim. App. 1996).

**C.    Analysis**

We first note that appellant states in his brief that he was granted a motion in limine which precluded, among other things, "references to any incidents of violence in [his] past." The trial court orally granted the motion in limine at the pre-trial hearing on the motion. However, only the defense's suggested written order appears in the record. No signed order by the trial court exists. For the purposes of this analysis, we will assume without deciding that appellant was granted the motion in limine.

Nevertheless, Petty's statement arguably did not violate the motion in limine because he did not reference any "*incidents* of violence." Instead, Petty merely stated that appellant "had a violent past." Petty's statement was vague and did not include details of appellant's "violent past," and the State did not emphasize the testimony or mention the testimony in its closing argument. And as appellant concedes, Petty's statement was unintentional. *See Martinez v. State*, 17 S.W.3d 677, 693 (Tex. Crim. App. 2000) (noting in its conclusion that the prosecutor's improper argument was "at most, only mildly improper" in part because the prosecutor did not reveal any specific facts); *Perez v. State*, 187 S.W.3d 110, 112–13 (Tex. App.—Waco 2006, no pet.) (considering whether the mistake was repeated and whether the mistake seemed inadvertent or intentional in the court's analysis of the first *Mosley* factor). As such, the prejudicial effect of Petty's statement was low.

As to curative measures, the trial court instructed the jury to disregard all of Petty's testimony. A prompt instruction to disregard will ordinarily cure error associated with improper testimony. *Irsan v. State*, 708 S.W.3d 584, 614 (Tex. Crim. App. 2025); *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000); *Herrero v. State*, 124 S.W.3d 827,

18

836 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (providing this presumption is applicable in cases where the curative instruction follows a violation of a motion in limine). Appellant contends, without citing authority, that the trial court's instruction went too far and excusing the jury brought unwarranted attention to Petty's statement. However, we must presume the jury followed the instruction of the trial court absent evidence of the contrary. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009). Appellant points to nothing in the record, and we find nothing supporting a conclusion that the jury did not follow the trial court's instruction.

As to the certainty of conviction absent the misconduct, appellant argues that this factor weighs in favor of a mistrial because evidence of appellant's intent "was not overwhelming, . . . the jury's determination of guilt rested on circumstantial and inferential evidence," and "the jury acquitted [appellant] of capital murder charges." However, as we concluded previously, Petty's statement was inadvertent and vague, and the State did nothing to emphasize his testimony. A mistrial is only warranted in the most extreme of circumstances. *Ocon*, 284 S.W.3d at 884. We fail to see how Petty's statement was "so emotionally inflammatory" that the trial court's curative instructions were "not likely to prevent the jury being unfairly prejudiced against" appellant. *See Bauder*, 921 S.W.2d at 698.

We hold that the trial court did not abuse its discretion when it denied appellant's motion for mistrial. We overrule appellant's fifth issue.

## VI. PREJUDICIAL EVIDENCE

By his last issue, appellant argues that the trial court abused its discretion when, during the punishment phase of trial, it allowed into evidence a video excerpt of

19

appellant's interrogation wherein a detective accused appellant "of being a violent person based on his prior incarceration in what [appellant] describe[d] as a 'supermax prison.'"

## A. Background Facts

During the punishment phase, the State sought to introduce State's Exhibit 1005, a video excerpt of one of appellant's interviews with Brank and Harris. In the exhibit, appellant tells the detectives that he spent his whole life in prison, and Harris asks appellant what prison. Appellant then lists several federal and state prisons, including "Pontiac supermax":

> Appellant: State of Illinois. Pontiac supermax. You know Pontiac supermax?
>
> Harris: Yo, they don't put you on supermax prison just because you're a pretty good guy and you kinda follow all the rules and regulations and all that kind of stuff. You're a pretty violent person, [appellant]. You're violent. You don't agree with that?

Appellant says he disagrees, and Harris responds: "Then why would you be on supermax prisons? Can't lie to me about that, [appellant], I was there for fourteen years. So don't bullshit me about that. You're on supermax prisons because you had a violent past." Brank adds, before the clip ends, "And you didn't wanna go back."

Appellant's trial counsel objected to State's Exhibit 1005, arguing that it was irrelevant and more prejudicial than probative. Counsel also contended that

> With regard to what's known as super-max, [appellant] was never housed in what's actually known as super-max, which is in Colorado in the middle of the mountains. He was in a maximum security prison if you want to—in Leavenworth, that's what that would be, but he's not at super-max itself. That's just not accurate.

The State contested the accuracy of counsel's assertion and further argued that the distinction between a "super-max" or "maximum security" prison was not relevant

because appellant, not the detectives, used the term "super-max." The trial court denied appellant's objections, and State's Exhibit 1005 was played for the jury.

**B.      Standard of Review & Applicable Law**

The Code of Criminal Procedure Article 37.07, Section 3(a) governs the admissibility of evidence during the punishment phase of a non-capital trial. TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(a). It states in pertinent part

> Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

*Id.* In other words, Article 37.07, Section 3(a)(1) allows for admission of any evidence the trial court "deems relevant to sentencing," including the defendant's prior criminal record, character, and general reputation. *Id.*

Admissible evidence may violate Rule 403 and, therefore, be inadmissible, if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403. We consider the following nonexclusive factors when conducting a Rule 403 analysis: "(1) the probative value of the evidence; (2) the potential to impress the jury in some irrational yet indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence." *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005). "Under Rule 403, it is presumed that the probative value of relevant evidence exceeds any danger of unfair prejudice." *Hammer v. State*, 296

S.W.3d 555, 568 (Tex. Crim. App. 2009) (citations omitted). "The rule envisions exclusion of evidence only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value." *Id.* (citation modified).

A trial court's decision to exclude evidence is reviewed for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). We uphold the trial court's ruling on a Rule 403 balancing test if it is within the zone of reasonable disagreement. *Id.*

## C.    Analysis

Appellant first argues that State's Exhibit 1005 was irrelevant, and alternatively, that the exhibit was more prejudicial than probative. However, appellant bears the burden to show the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *See Hammer*, 296 S.W.3d at 568. In this case, the State alleged that appellant had four prior felony convictions in enhancement paragraphs at trial, one of which alleged that appellant had been previously convicted in Illinois of "Unlawful Possession of a Controlled Substance with Intent to Deliver." Appellant disputed the prior convictions, and appellant specifically challenged the out-of-state penitentiary packet of the Illinois offense because it did not contain appellant's fingerprints. By contesting the out of state conviction, appellant increased the relevance and probative value of State's Exhibit 1005 because it contained a direct statement from appellant that he was, in fact, incarcerated in an Illinois state prison. *See* Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a). The jury also could have considered the dispute between appellant and Harris about whether appellant was a "violent person" because a defendant's prior criminal record, character, and general reputation are all relevant at sentencing. *See id.*

Turning to appellant's 403 objection, two of the factors weigh in the State's favor. *See Mechler*, 153 S.W.3d at 440. The probative nature of the exhibit and the State's need for the evidence was high. Accordingly, appellant did not overcome the presumption that the probative value of the exhibit exceeds any danger of unfair prejudice. *See Hammer*, 296 S.W.3d at 568. We hold that the trial court did not abuse its discretion when it admitted State's Exhibit 1005 over appellant's objection. We overrule this issue.

## VII. CONCLUSION

The trial court's judgment is affirmed.

JON WEST
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
26th day of March, 2026.